# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LENORE R. OWENS, JEAN L. JEWETT, LORI L. BUKSAR, and JULIA SNYDER, on behalf of themselves, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ST. ANTHONY MEDICAL CENTER, INC. ("SAMC"), THE FRANCISCAN SISTERS OF CHICAGO SERVICE CORPORATION ("FSCSC"), FRANCISCAN COMMUNITIES, INC. f/k/a FRANCISCAN HOMES & COMMUNITY SERVICES, FRANCISCAN HOLDING CORPORATION, FRANCISCAN ALLIANCE, INC., DONNA GOSCIEJ, LINDA HORNYAK, the SAMC RETIREMENT COMMITTEE, the members of the SAMC RETIREMENT COMMITTEE, LEONARD WYCHOCKI, WALTER GARBARCZYK, JULIE SECVIAR, CHESTER LABUS, and SISTER HELENE GALUSZKA, the members of the FSCSC BOARD OF DIRECTORS, SISTER M. FRANCIS CLARE RADKE, SISTER M. FRANCINE LABUS, ANNETTE SHOEMAKER, JILL KRUEGER, LAWRENCE LEAMAN, SANDRA SINGER, SUSAN NORDSTROM LOPEZ, and JOHN and JANE DOES, each an individual, 1-40,<br><br>Defendants. | Case No: 1:14-cv-04068<br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br><br>**CLAIM OF UNCONSTITUTIONALITY** |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................. 1

II.   JURISDICTION AND VENUE ......................................... 5

III.  PARTIES ............................................................................ 7

    A.    Plaintiffs ................................................................ 7

    B.    Defendants ............................................................ 9

IV.  THE BACKGROUND OF THE CHURCH PLAN EXEMPTION ............................. 16

    A.    The Adoption of ERISA ................................... 16

    B.    The Scope of the Church Plan Exemption in 1974 ............................ 17

    C.    The Changes to the Church Plan Exemption in 1980 ........................ 18

V.   FSCSC AND SAMC ......................................................... 22

    A.    FSCSC's and SAMC's Operations ................ 22

         1.    FSCSC ................................................... 22

         2.    SAMC .................................................... 26

    B.    The Retirement Plan ........................................ 27

         1.    The Retirement Plan was Originally Established as an ERISA Plan in 1975 ................................................. 27

         2.    The Retirement Plan Seeks Church Plan Status in 1989 ....................... 30

         3.    The Conversion of the Retirement Plan from an Insured Annuity Plan to a Trusteed Plan in 1995 ............................ 31

         4.    The Sale of St. Anthony Hospital and Freezing of the Retirement Plan in 1998 and 1999 ......................... 32

         5.    The Operation of the Plan ........................ 33

         6.    The Purported Termination of the Retirement Plan in 2012 .................. 36

         7.    The Impact of the Declared Termination upon Plaintiffs ....................... 39

8.    The Retirement Plan Meets the Definition of an ERISA Defined Benefit Plan ................................................................. 43

9.    FSCSC and SAMC were the Plan Sponsors of the Retirement Plan and all Defendants were Fiduciaries of the Retirement Plan ................. 44

10.    The Retirement Plan Is Not a Church Plan ............................................ 46

    a.    Only Two Types of Plans May Qualify as a Church Plan and the Retirement Plan is Neither ............................. 46

    b.    Even if the Retirement Plan Could Otherwise Qualify as a Church Plan under ERISA §§ 3(33)(A) or (C)(i), it is Excluded From Church Plan Status under ERISA § 3(33)(B)(ii) .................................................................. 53

    c.    Even if the Retirement Plan Could Otherwise Qualify as a Church Plan under ERISA, the Church Plan Exemption, as Claimed by SAMC and FSCSC, Violates the Establishment Clause of the First Amendment of the Constitution and Is Therefore Void and Ineffective .................................... 54

11.    The Defendants Engaged in Fraud and Concealment of the True Financial Condition of the Plan ............................................................ 55

VI.    CLASS ALLEGATIONS .......................................................................................... 57

    A.    Numerosity ........................................................................................................ 57

    B.    Commonality .................................................................................................... 58

    C.    Typicality .......................................................................................................... 59

    D.    Adequacy .......................................................................................................... 60

    E.    Rule 23(b)(1) Requirements ........................................................................... 60

    F.    Rule 23(b)(2) Requirements ........................................................................... 61

    G.    Rule 23(b)(3) Requirements ........................................................................... 61

VII.    CAUSES OF ACTION .............................................................................................. 62

# TABLE OF CONTENTS

Page

COUNT I ......................................................................................................... 62

    (Claim for Equitable Relief Pursuant to ERISA § 502(a)(3))  Against Defendants
        SAMC and FSCSC ........................................................................... 62

COUNT II ....................................................................................................... 63

    (Claim for Failure to Terminate the Plan in Compliance With ERISA § 4041)
        Against Defendants SAMC and FSCSC....................................................... 63

COUNT III....................................................................................................... 65

    (Claim for Declaratory Relief That The Plan Should Be Terminated and SAMC,
        the Participating Employers and FSCSC Are Jointly and Severally Liable
        for Payment of Unfunded Benefits Due Under the Plan and Payment of
        Minimum Funding Contributions to the Plan ) Against FSCSC, SAMC,
        and the Participating Employers ......................................................... 65

COUNT IV....................................................................................................... 68

    (Claim for Violation of Reporting and Disclosure Provisions) Against Defendants
        SAMC and FSCSC, the Retirement Committee and/or the  Members of the
        Retirement Committee ....................................................................... 68

COUNT V ....................................................................................................... 72

    (Claim for Failure to Provide Minimum Funding) Against Defendants SAMC,
        FSCSC, and the Participating Employers ............................................. 72

COUNT VI....................................................................................................... 74

    (Claim for Failure to Establish the Plan Pursuant to a Written Instrument  Meeting
        the Requirements of ERISA § 402) Against Defendants SAMC and/or
        FSCSC............................................................................................... 74

COUNT VII ..................................................................................................... 75

    (Claim for Failure to Establish a Trust Meeting the Requirements of ERISA §
        403) Against Defendants SAMC and/or FSCSC .................................. 75

COUNT VIII..................................................................................................... 76

    (Claim for Civil Money Penalty Pursuant to ERISA § 502(a)(1)(A))  Against
        Defendants SAMC and/or FSCSC, the Retirement Committee  and/or the
        Members of the Retirement Committee.............................................. 76

# TABLE OF CONTENTS

Page

COUNT IX..................................................................................................................78

(Claim for Benefits Pursuant to ERISA § 502(a)(1)(B)) Against All Defendants .........78

COUNT X....................................................................................................................79

(Claim for Violation of the Anti-Cutback Provision of ERISA § 204(g)) Against
Defendants SAMC, FSCSC, the Retirement Committee  and/or the
Members of the Retirement Committee.............................................................79

COUNT XI...................................................................................................................80

(Claim for Breach of Fiduciary Duty) Against Defendants SAMC, FSCSC, the
Retirement Committee and the Individual  Defendants.....................................80

COUNT XII ................................................................................................................85

(Claim for Breach of Fiduciary Duty to Monitor) Against FSCSC, SAMC and the
FSCSC Board of Director Defendants................................................................85

COUNT XIII ...............................................................................................................88

(Claim For Co-Fiduciary Liability) Against SAMC, FSCSC, and the Individual
Defendants ........................................................................................................88

COUNT XIV................................................................................................................91

(Claim for Declaratory Relief that the Church Plan Exemption, as Claimed  by
SAMC and/or FSCSC, Violates the Establishment Clause of the First
Amendment of the Constitution and is Therefore Void and Ineffective) ...........91

VIII.    PRAYER FOR RELIEF ................................................................................94

Plaintiffs, Lenore R. Owens, Jean L. Jewett, Lori L. Buksar, and Julia Snyder, individually and on behalf of all those similarly situated, by and through their attorneys, hereby allege as follows:

## I.    INTRODUCTION

1.    This case concerns improper cutbacks in retirement benefits owed to hospital and nursing home employees who have accounts in the St. Anthony Medical Center Retirement Plan (the "Retirement Plan" or the "Plan").

2.    Defendants St. Anthony Medical Center, Inc. ("SAMC") and the Franciscan Sisters of Chicago Service Corporation ("FSCSC") failed to comply with the requirements of the Employee Retirement Income Security Act ("ERISA") based on their erroneous claim that the Retirement Plan qualifies as a "Church Plan," and is therefore not required to comply with ERISA.  As a result of their erroneous claim, Defendants SAMC and FSCSC have failed to maintain, operate, or terminate the Plan as required under ERISA.

3.    By cutting the benefits of Plan participants and beneficiaries, Defendants SAMC, Franciscan Communities, Inc. ("Communities"), and Franciscan Holding Corporation ("Holding Corp") (the Plan's participating employers) and members of one of the participating employer's controlled group – FSCSC and Franciscan Alliance Inc. ("Franciscan Alliance"), were financially benefitted by not having to adequately fund the Plan, provide notice to participants and beneficiaries of the status of the Plan's financial condition, or pay for federal pension insurance, all to the detriment of the Plan participants whose pension benefits were significantly cut back when the uninsured Plan was frozen and then terminated in an underfunded state.  Consequently, Plan participants

are now forced to live on reduced pension payments that are 30-40% less than what they were previously receiving, or what they were otherwise entitled to receive under ERISA.

4.      Defendants SAMC and FSCSC also failed to terminate the Plan in compliance with ERISA § 4041, 29 U.S.C. § 1341, which governs the requirements for Plan termination under ERISA.  In relevant part, ERISA prohibits termination of plans with insufficient assets. The only exception is in the case of a distress termination of a plan. As a result of Defendants' improper termination of the Plan, Plaintiffs and members of the Class lost 30-40% of their vested accrued benefits.

5.      Neither the contributing sponsors (SAMC, Communities, and Holding Corp.) nor members of their controlled group (FSCSC and Franciscan Alliance) satisfied the criteria for a distress termination under ERISA. ERISA § 4041(c), 29 U.S.C. § 1341(c). Additionally, SAMC and FSCSC failed to issue the proper notice to each affected party and the Pension Benefit Guaranty Corporation ("PBGC"), as required to effectuate plan termination under ERISA. Therefore, the Plan is still in existence as an ERISA-covered plan, and Plan participants are entitled to receive the full amount of benefits promised under the Plan from SAMC and the other participating employers.

6.      In the event that Defendants SAMC, Communities, and Holding Corp. were and/or are unable to pay the minimum funding contributions necessary to pay the benefits due to Plaintiffs and members of the Class, all controlled group members of the participating employers (specifically, FSCSC and Franciscan Alliance) continue to be jointly and severally liable to make such contributions pursuant to ERISA §§ 302 and 4062, 29 U.S.C. §§ 1082 and 1362.

7.      As its name implies, ERISA was crafted to protect employee retirement

funds.  A comprehensive history of ERISA put it this way:

> Employees should not participate in a pension plan for many years only to
> lose their pension . . . because their plan did not have the funds to meet its
> obligations.  The major reforms in ERISA—fiduciary standards of
> conduct, minimum vesting and funding standards, and a government-run
> insurance program—aimed to ensure that long-service employees actually
> received the benefits their retirement plan promised.

James Wooten, THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974: A

POLITICAL HISTORY 3 (U. Cal. 2004).

8.      This class action is brought on behalf of participants and beneficiaries of

the Retirement Plan, a defined benefit pension plan that was established, maintained,

administered and sponsored by SAMC and FSCSC.  SAMC and FSCSC violated

numerous provisions of ERISA—including underfunding accrued benefit obligations of

the Plan by over $32 million—while erroneously claiming that the Retirement Plan was

exempt from ERISA's protections because it was a "Church Plan."  But the Retirement

Plan never met the definition of a Church Plan under ERISA because neither SAMC nor

FSCSC was a church, or a convention or association of churches, and because the

Retirement Plan was not established by a church or a convention or association of

churches.  That should be the end of the inquiry under ERISA, resulting in a clear finding

that the Retirement Plan was not a Church Plan.

9.      SAMC and FSCSC may claim that they were permitted to establish their

own Church Plan under ERISA, even though they are not churches, because they are

organizations "controlled by" or "associated with" a church within the meaning of

ERISA.  Even if ERISA permitted such non-church entities to establish Church Plans,

which it does not, SAMC and FSCSC were not controlled by a church, as the evidence

will show.  Moreover, SAMC and FSCSC were not "associated with" a church within the meaning of ERISA because they did not, as ERISA requires, "share common religious bonds and convictions" with a church.

10.     FSCSC, and certain of its affiliated subsidiaries, is a non-profit senior living community system not unlike other non-profit senior living community systems with whom FSCSC has chosen to compete in its commercial healthcare activities. SAMC is a corporate subsidiary of FSCSC and formerly owned St. Anthony Medical Center, a hospital that competed in commercial healthcare activities with other health care systems. FSCSC and SAMC have never been owned or operated by a church nor have they received funding from a church.  No denominational requirement existed for the employees of FSCSC and SAMC.  Indeed, SAMC and FSCSC told prospective employees that they are equal opportunity employers, making any choice of faith, or lack thereof, irrelevant in the recruiting and hiring of their employees.  In choosing to recruit and hire from the population at large, FSCSC and SAMC must also be willing to accept neutral, generally applicable regulations, such as ERISA, imposed to protect those employees' legitimate interests.

11.     If FSCSC and SAMC, non-church organizations, could establish a Church Plan, which Plaintiffs dispute, the Court would be required to evaluate many levels of evidence to determine whether FSCSC and SAMC share common "religious bonds and convictions" with a church.

12.     Moreover, if the Court weighed all this evidence and determined that SAMC and/or FSCSC did share common bonds and convictions with a church, the Church Plan exemption, as applied to FSCSC and SAMC, would then be an

unconstitutional accommodation under the Establishment Clause of the First

Amendment. SAMC and FSCSC claim, in effect, that the over 1,900 participants in the

Retirement Plan were exempt from ERISA protections, and both SAMC and FSCSC

were relieved of their ERISA financial obligations, because SAMC and FSCSC claim to

adhere to certain religious beliefs. The Establishment Clause, however, does not allow

such an economic preference for SAMC and/or FSCSC, and consequent burden-shifting

to former employees of SAMC. Extension of the Church Plan exemption to SAMC and

FSCSC would be unconstitutional under Supreme Court law because it: (a) is not

necessary to further the stated purposes of the exemption; (b) harms former SAMC

workers; (c) puts FSCSC's competitors at an economic disadvantage; (d) relieves SAMC

and FSCSC of no genuine religious burden created by ERISA; and (e) creates more

government entanglement with alleged religious beliefs than compliance with ERISA

creates.

     13.    FSCSC's and SAMC's claim of Church Plan status for the Retirement

Plan fails under both ERISA and the First Amendment. Plaintiffs seek an Order

requiring Defendants to comply with ERISA and afford the Class all accrued benefits to

which they are entitled under the terms of the Retirement Plan and ERISA, as well as an

Order finding that the Church Plan exemption, as claimed by the Defendants, is

unconstitutional because it violates the Establishment Clause of the First Amendment.

## II.   JURISDICTION AND VENUE

     14.   **Subject Matter Jurisdiction.** This Court has jurisdiction over Counts I

through XIV pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the

laws of the United States and pursuant to ERISA § 502(e)(1) and § 4070 (c), 29 U.S.C. §

1132(e)(1) and § 1370(c), which provide for federal jurisdiction of actions brought under Title I and Title IV of ERISA.

15.    **Personal Jurisdiction.**  This Court has personal jurisdiction over all Defendants because ERISA provides for nationwide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and ERISA § 4070(c), 29 U.S.C. § 1370(c).  All of the Defendants are either residents of the United States or subject to service in the United States, and the Court therefore has personal jurisdiction over them.  The Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to a court of general jurisdiction in Illinois as a result of FSCSC being headquartered in, transacting business in, and having significant contacts with this District.

16.    **Venue.**  Venue as to Counts I through XIV is proper in this district pursuant to ERISA §§  502(e)(2) and 4070(c), 29 U.S.C. § 1132(e)(2) and 1370(c), because (a) the Retirement Plan was administered in this District, (b) some or all of the violations of ERISA took place in this District, and/or (c) SAMC, FSCSC, and Defendant Franciscan Communities, Inc. may be found in this District.

17.    Venue as to all Counts is also proper in this District pursuant to 28 U.S.C. § 1391 because SAMC, FSCSC, and Defendant Franciscan Communities, Inc. are headquartered in this District, systematically and continuously do business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.   PARTIES

**A.    Plaintiffs**

18.    **Plaintiff Lenore R. Owens.**  Plaintiff Owens was employed as a medical transcriptionist at St. Anthony Medical Center ("St. Anthony" or the "Hospital") in Crown Point, Indiana, from June 9, 1976 until approximately 2000.  Plaintiff Owens is a participant in the Retirement Plan because she was eligible for a pension benefit under the Retirement Plan, began receiving a pension benefit from the Retirement Plan in 2010 at normal retirement age, and received a substantially reduced pension benefit from the Retirement Plan when Defendants SAMC and FSCSC improperly declared that the Plan had been terminated.  Additionally and alternatively, Plaintiff Owens has a colorable claim to additional benefits under the Retirement Plan and is a participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and is therefore entitled to maintain an action with respect to the Retirement Plan pursuant to ERISA §§ 502(a)(1)(A) and (B), (a)(2), (a)(3), and (c)(1) and (3), 29 U.S.C. §§ 1132(a)(1)(A) and (B), (a)(2), (a)(3), and (c)(1) and (3).  As a participant, Plaintiff Owens is also entitled to maintain an action with respect to the Retirement Plan pursuant to ERISA § 4070, 29 U.S.C. § 1370.

19.    **Plaintiff Jean L. Jewett**.  Plaintiff Jewett was employed at St. Anthony from March 24, 1975 until November 19, 2006.  Plaintiff Jewett is a participant in the Retirement Plan because she was eligible for and began receiving a pension benefit from the Retirement Plan in 2006 and received a substantially reduced pension benefit from the Retirement Plan when Defendants SAMC and FSCSC improperly declared that the Plan had been terminated.  Additionally and alternatively, Plaintiff Jewett has a colorable claim to additional benefits under the Retirement Plan and is a participant, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and is therefore entitled to maintain an

action with respect to the Retirement Plan pursuant to ERISA §§ 502(a)(1)(A) and (B), (a)(2), (a)(3), and (c)(1) and (3), 29 U.S.C. §§ 1132(a)(1)(A) and (B), (a)(2), (a)(3), and (c)(1) and (3). As a participant, Plaintiff Jewett is also entitled to maintain an action with respect to the Retirement Plan pursuant to ERISA § 4070, 29 U.S.C. § 1370.

20. **Plaintiff Lori L. Buksar.** Plaintiff Buksar has been employed as a surgical technician and/or a nurse at St. Anthony from 1980 until the present. Plaintiff Buksar is a participant in the Retirement Plan because she was eligible to receive a pension benefit and received a substantially reduced pension benefit from the Retirement Plan when Defendants SAMC and FSCSC improperly declared that the Plan had been terminated. Additionally and alternatively, Plaintiff Buksar has a colorable claim to additional benefits under the Retirement Plan and is a participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and is therefore entitled to maintain an action with respect to the Retirement Plan pursuant to ERISA §§ 502(a)(1)(A) and (B), (a)(2), (a)(3), and (c)(1) and (3), 29 U.S.C. §§ 1132(a)(1)(A) and (B), (a)(2), (a)(3), and (c)(1) and (3). As a participant, Plaintiff Buksar is also entitled to maintain an action with respect to the Retirement Plan pursuant to ERISA § 4070, 29 U.S.C. § 1370.

21. **Plaintiff Julia Snyder.** Plaintiff Snyder was employed as a nurse at St. Anthony from June 1, 1981 until May 13, 2004. Plaintiff Snyder was a participant in the Retirement Plan because she was eligible to receive a pension benefit under the Plan and thereafter received a substantially reduced pension benefit from the Retirement Plan when Defendants SAMC and FSCSC improperly declared that the Plan had been terminated. Additionally and alternatively, Plaintiff Snyder has a colorable claim to additional benefits under the Retirement Plan and is a participant within the meaning of

ERISA § 3(7), 29 U.S.C. § 1002(7), and is therefore entitled to maintain an action with respect to the Retirement Plan pursuant to ERISA §§ 502(a)(1)(A) and (B), (a)(2), (a)(3), and (c)(1) and (3), 29 U.S.C. §§ 1132(a)(1)(A) and (B), (a)(2), (a)(3), and (c)(1) and (3). As a participant, Plaintiff Snyder is also entitled to maintain an action with respect to the Retirement Plan pursuant to ERISA § 4070, 29 U.S.C. § 1370.

## B.    Defendants

22.    **Defendant St. Anthony Medical Center, Inc. ("SAMC").** SAMC is a 501(c)(3) non-profit corporation organized under and governed by Title 23, Article 17 of the Indiana Code, Ind. Code § 23-17. SAMC is headquartered in Homewood, Illinois.

23.    **Defendant Franciscan Sisters of Chicago Service Corporation ("FSCSC").**[1] Defendant FSCSC is a 501(c)(3) non-profit corporation organized under and governed by the Illinois General Not-For-Profit Corporation Act of 1986, 805 ILCS 105, and is headquartered in Homewood, Illinois. Defendant FSCSC is the sole corporate member of SAMC and Franciscan Communities, Inc., two of the participating employers in the Plan. Defendant FSCSC is an employer responsible for maintaining the Retirement Plan and is therefore the plan sponsor of the Retirement Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). Defendant FSCSC, on information and belief, also served as the plan administrator for the Retirement Plan and is, therefore, the plan administrator of the Retirement Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A) and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

24.    **Defendant Donna Gosciej.** Defendant Gosciej is the Vice President of Human Resources for FSCSC. Upon information and belief, Defendant Gosciej's job

---

[1] On February 16, 2015, FSCSC changed its name to Franciscan Ministries. Dkt. No. 155. For continuity, the Second Amended Class Action Complaint refers to Franciscan Ministries as FSCSC.

responsibilities included administrative oversight of the Retirement Plan and she exercised discretionary authority or discretionary control respecting management of the Retirement Plan, exercised authority or control respecting management or disposition of the Retirement Plan's assets and/or had discretionary authority or discretionary responsibility in administration of the Retirement Plan. Defendant Gosciej is and was a fiduciary of the Retirement Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

25.     **Defendant Linda Hornyak.**  Defendant Hornyak is the Manager of Compensation and Benefits for FSCSC.  Upon information and belief, Defendant Hornyak's job responsibilities included administrative oversight of the Retirement Plan and she exercised discretionary authority or discretionary control respecting management of the Retirement Plan, exercised authority or control respecting management or disposition of the Retirement Plan's assets and/or had discretionary authority or discretionary responsibility in administration of the Retirement Plan. Defendant Hornyak is and was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

26.     **Defendant SAMC Retirement Committee.**  Pursuant to the operative Plan Document, the Defendant SAMC Retirement Committee had sole responsibility for administration of the Plan and the management of the Plan assets as designated by the terms of the instrument under which the plan is operated, including the power to construe and interpret the Plan, decide all questions of eligibility, determine benefits, and authorize payment of benefits, prepare and distribute information regarding the Plan, receive, review, and report on the financial condition of the plan, appoint, employ or

designate individuals to assist in the administration of the Plan, and exercise any powers and duties the Board may delegate to the Committee.  In light of the foregoing duties and responsibilities the Defendant SAMC Retirement Committee was the administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), a named fiduciary of the Plan within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), as well as a fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that the Defendant SAMC Retirement Committee had and/or exercised discretionary authority or discretionary control with respect to management or administration of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets.

27.     **Members of the SAMC Retirement Committee.**  The members of the SAMC Retirement Committee were, on information and belief, persons specifically designated by SAMC and/or FSCSC to administer the Retirement Plan and were, therefore, the fiduciaries of the Retirement Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that each exercised or had discretionary authority or discretionary control with respect to management or administration of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets.  The members of the SAMC Retirement Committee include, among others, the following individuals:

> i) **Defendant Leonard Wychocki.** Leonard Wychocki was the President of the FSCSC from 1994 to 2007.

> ii) **Defendant Walter Garbarczyk.**  Walter Garbarczyk was the Chief Operating Officer of FSCSC.

iii) **Defendant Julie Secviar.**  Julie Secviar was the Senior Vice President of Strategic Resources of FSCSC from 1998 to 2008.

iii) **Defendant Chester Labus.**   Chester Labus was Chief Financial Officer of FSCSC from 2000 to 2009.

iv) **Defendant Sister Helene Galuszka.** Sister Helene Galuszka is General Councilor of FSCSC.

28.     **Defendants John and Jane Does 21-40.**  Defendants John and Jane Does 21-40 are individuals who, through discovery, are found to have fiduciary responsibilities with respect to the Retirement Plan and are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  These individuals will be added by name as Defendants in this action upon motion by Plaintiffs at an appropriate time.  Defendant Gosciej, Defendant Hornyak, the Defendant Members of the SAMC Retirement Committee, and John and Jane Does 21-40 are referred to herein collectively as the "Individual Defendants."

29.     **Members of the FSCSC Board of Directors:**  On information and belief the FSCSC Board of Directors has the power to appoint and remove and did appoint and remove the members of the SAMC Retirement Committee. In light of the foregoing duties, responsibilities, and actions, the FSCSC Board of Director Defendants are fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets, through the appointment of the members of the SAMC Retirement Committee. The members of the FSCSC Board of Directors, who are collectively referred

to as the "FSCSC Board of Director Defendants" include, among others, the following individuals:

> i) **Defendant Sister M. Francis Clare Radke, OFS**:  Sister M. Francis Clare Radke, OFS, was the Chairman of the FSCSC Board of Directors.
>
> ii) **Defendant Sister M. Francine Labus, OFS**:  Sister M. Francine Labus, OFS, was the Vice Chairman and Secretary of the FSCSC Board of Directors.
>
> iii) **Defendant Annette Shoemaker**:  Annette Shoemaker was a member of the FSCSC Board of Directors.
>
> iv) **Defendant Jill Krueger**:  Jill Krueger was a member of the FSCSC Board of Directors.
>
> v)  **Defendant Lawrence Leaman**:  Lawrence Leaman was a member of the FSCSC Board of Directors.
>
> vi) **Defendant Sandra Singer**:  Sandra Singer was a member of the FSCSC Board of Directors.
>
> vii) **Defendant Susan Nordstrom Lopez**: Susan Nordstrom Lopez was a member of the FSCSC Board of Directors.

30.     **Defendants John and Jane Does 1-20.**   Defendants John and Jane Does 1-20 are individuals who, through discovery, are found to be additional members of the Retirement Committee and/or the FSCSC Board of Directors.  Defendants John and Jane Does 1-20 will be added by name as Defendants in this action upon motion by Plaintiffs at an appropriate time.

31.    **The Participating Employers.**  In addition to SAMC, the Retirement
Plan identifies two other entities as "participating employers" that have responsibility
for making funding contributions to the Plan.   Based on the terms of the Plan, each
participating employer is a "contributing employer" under ERISA § 4001(a)(13), 29
U.S.C. § 1301(a)(13) and ERISA § 302(b)(1), 29 U.S.C. § 1082(b)(1) because the Plan
states that each participating employer is responsible for making contributions to or
under the Plan.  Accordingly, each participating employer is liable under ERISA
§§ 4062(a), 4062(b)(1)(A), 29 U.S.C. §§1362(a), 1362(b)(1)(A) for "the total amount
of the unfunded benefit liabilities (as of the termination date) to all participants and
beneficiaries under the plan, together with interest[.]"  These defendant entities, which
are collectively referred to as the "Participating Employers," include:

i) **Defendant Franciscan Communities, Inc.**:  Franciscan Communities, Inc., on
information and belief was formerly known as Franciscan Homes & Community
Services, and is a 501(c)(3) non-profit corporation headquartered in Homewood,
Illinois, whose sole corporate member is FSCSC.  The Plan and Summary Plan
Description for the Plan identifies Communities as a participating employer who
was responsible for making contributions to and funding the Plan.  Accordingly,
Communities is a "contributing sponsor" within the meaning of ERISA §
4001(a)(13), 29 U.S.C. § 1301(a)(13) and an employer responsible for making
contributions under the Plan as described in ERISA § 302(b)(1), 29 U.S.C. §
1082(b)(1). As a "contributing sponsor," Communities also is liable under
§§ 4062(a), 4062(b)(1)(A), 29 U.S.C. §§1362(a), 1362(b)(1)(A) for "the total

amount of the unfunded benefit liabilities (as of the termination date) to all

participants and beneficiaries under the plan, together with interest[.]"

ii) **Defendant Franciscan Holding Corporation**:  Franciscan Holding

Corporation ("Holding Corp.") is an Indiana for-profit domestic corporation.  The

Plan and Summary Plan Description for the Plan identify Holding Corp. as a

participating employer who was responsible for funding and making contributions

to the Plan. Accordingly, Holding Corp. is a "contributing sponsor" within the

meaning of ERISA § 4001(a)(13), 29 U.S.C. § 1301(a)(13) and an employer

responsible for making contributions under the Plan as described in ERISA

§ 302(b)(1), 29 U.S.C. 1082(b)(1).  As a "contributing sponsor" Holding Corp.

also is liable under ERISA §§ 4062(a), 4062(b)(1)(A), 29 U.S.C. §§1362(a),

1362(b)(1)(A) for "the total amount of the unfunded benefit liabilities (as of the

termination date) to all participants and beneficiaries under the plan, together with

interest[.]" Holding Corp. is headquartered in Crown Point, Indiana.  Holding

Corp. is 100% owned by Defendant Franciscan Alliance, Inc.

32.    **Defendant Franciscan Alliance, Inc**.:  Franciscan Alliance, Inc. is an

Indiana non-profit corporation formed pursuant to the provisions of the Indiana

Nonprofit Corporation Act of 1991, and is headquartered in Mishawaka, Indiana.

Defendant Franciscan Alliance owns 100% of Holding Corp. and thus is a member of

the controlled group for Defendant Holding Corp. (under ERISA § 4001(a)(14), 29

U.S.C. § 1301(a)(14), and implementing regulations at 26 C.F.R. § 1.414(c)-2(b)). As a

member of Holding Corp.'s controlled group, Franciscan Alliance is jointly and

severally liable for satisfying "the minimum funding standard applicable to the plan for

any plan year," pursuant to ERISA § 302(a) and § 302(b)(2), as well as jointly and severally liable for "the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest" under ERISA §§ 4062(a), 4062(b)(1)(A), 29 U.S.C. §§1362(a), 1362(b)(1)(A).

## IV.   THE BACKGROUND OF THE CHURCH PLAN EXEMPTION

### A.   The Adoption of ERISA

33.   Following years of study and debate, and with broad bi-partisan support, Congress adopted ERISA in 1974, and the statute was signed into law by President Ford on Labor Day of that year.  Among the factors that led to the enactment of ERISA were the widely publicized failures of certain defined benefit pension plans, especially the plan for employees of Studebaker Corporation, an automobile manufacturing company which defaulted on its pension obligations in 1965.  *See generally* John Langbein, *et al.*, PENSION AND EMPLOYEE BENEFIT LAW 78-83 (2010) ("The Studebaker Incident").

34.   As originally adopted in 1974, and today, ERISA protects the retirement savings of pension plan participants in a variety of ways.  As to participants in traditional defined benefit pension plans, such as the plan at issue here, ERISA mandates, among other things, that such plans be currently funded and actuarially sound, that participants' accruing benefits vest pursuant to certain defined schedules, that the administrators of the plan report certain information to participants and to government regulators, that the fiduciary duties of prudence, diversification, loyalty, and compliance with plan terms apply to those who manage the plans, and that the benefits promised by the plans be guaranteed, up to certain limits, by the Pension Benefit Guaranty Corporation.  *See, e.g.*, ERISA §§ 303, 203, 101-106, 404-406, 409, 4007, 4022, 29 U.S.C. §§ 1083, 1053, 1021-1026, 1104-1106, 1109, 1307, 1322.

35.     ERISA is centered on pension plans, particularly defined benefit pension plans, as is reflected in the very title of the Act, which addresses "retirement income security." However, ERISA also subjects to federal regulation defined contribution pension plans (such as 401(k) plans) and welfare plans, which provide health care, disability, severance and related non-retirement benefits. ERISA §§ 3(34) and (1), 29 U.S.C. §§ 1002(34) and (1).

**B.     The Scope of the Church Plan Exemption in 1974**

36.     As adopted in 1974, ERISA provided an exemption for certain plans, in particular governmental plans and Church Plans. Plans that met the statutory definitions were exempt from all of ERISA's substantive protections for participants. ERISA § 4(b)(2), 29 U.S.C. § 1003(b)(2) (exemption from Title I of ERISA); ERISA § 4021(b)(3), 29 U.S.C. § 1321(b)(3) (exemption from Title IV of ERISA).

37.     ERISA defined a Church Plan as a plan "established and maintained for its employees by a church or by a convention or associations of churches."[2]

38.     Under the 1974 legislation, although a Church Plan was required to be established and maintained by a church, it could also include employees of certain pre-existing agencies of such church, but only until 1982. ERISA § 3(33)(C) (1974), 29 U.S.C. § 1002(33)(C) (1974) (current version as amended at 29 U.S.C. § 1002(33) (West 2013)). Thus, under the 1974 legislation, a pension plan that was not established and maintained by a church could not be a Church Plan. *Id.*

---

[2] ERISA § 3(33)(A), 29 U.S.C. § 1002(33)(A). ERISA is codified in both the labor and tax provisions of the United States Code, titles 29 and 26 respectively. Many ERISA provisions appear in both titles. For example, the essentially identical definition of Church Plan in the Internal Revenue Code is found at 26 U.S.C. § 414(e).

### C.     The Changes to the Church Plan Exemption in 1980

39.     Church groups had two major concerns about the definition of "Church Plan" in ERISA as adopted in 1974.  The first, and far more important, concern was that a Church Plan after 1982 could not include the lay employees of agencies of a church.  The second concern that arose in the church community after 1974 was more technical.  Under the 1974 statute, all Church Plans, single-employer or multiemployer, had to be "established and maintained" by a church or a convention/association of churches.  This ignored the role of the churches' financial services organizations in the day-to-day management of the pension plans.  In other words, although Church Plans were "established" by a church, in practice they were often "maintained" and/or "administered" by a separate financial services organization of the church, usually incorporated and typically called a church "pension board."

40.     These two concerns ultimately were addressed when ERISA was amended in 1980 in various respects, including a change in the definition of "Church Plan." Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), H.R. 3904, 96th Cong. § 2 (1980).  The amended definition is current law.

41.     As to the first concern (regarding employees of agencies of a church), Congress included a new definition of "employee" in subsection (C)(ii)(II) of section 3(33) of ERISA.  29 U.S.C. § 1002(33)(C)(ii)(II) (1980) (current version at 29 U.S.C. § 1002(33)(C)(ii)(II) (West 2013)).  As amended, an "employee" of a church or a convention/association of churches includes an employee of an organization "which is controlled by or associated with a church or a convention or association of churches."  *Id.* The phrase "associated with" is then defined in ERISA § 3(33)(C)(iv) to include only those organizations that "share[] common religious bonds and convictions with that

church or convention or association of churches." 29 U.S.C. § 1002(33)(C)(iv) (1980)

(current version at 29 U.S.C. § 1002(33)(C)(iv) (West 2013)).  Although this new

definition of "employee" permitted a "Church Plan" to include among its participants

employees of organizations controlled by or associated with the church, convention, or

association of churches, it remains the case that a plan covering such "employees" cannot

qualify as a "Church Plan" unless it was "established by" the church, convention, or

association of churches.  ERISA § 3(33)(A), 29 U.S.C. § 1002(33)(A) (West 2013).

     42.    As to the second concern (regarding plans "maintained by" a separate

church pension board), the 1980 amendment spoke to the issue as follows:

> A plan established and maintained for its employees (or
> their beneficiaries) by a church or by a convention or
> association of churches includes a plan maintained by an
> organization, whether a civil law corporation or otherwise,
> *the principal purpose or function of which is the*
> *administration or funding of a plan or program for the*
> *provision of retirement benefits or welfare benefits*, or both,
> for the employees of a church or a convention or
> association of churches, if such organization is controlled
> by or associated with a church or a convention or
> association of churches.

ERISA § 3(33)(C)(i) (1980), 29 U.S.C. § 1002(33)(C)(i) (1980) (emphasis added)

(current version at 29 U.S.C. § 1002(33)(C)(i) (West 2013)).  Accordingly, under this

provision, a plan "established" by a church or a convention or association of churches

could retain its "Church Plan" status even if the plan was "maintained" by a distinct

organization, so long as (1) "the principal purpose or function of [the organization] is the

administration or funding of a plan or program for the provision of retirement benefits or

welfare benefits," and (2) the organization is "controlled by or associated with" the

church or convention or association of churches.  *Id.*

43.     This church "pension board" clarification has no bearing on plans that were not "established" by a church or convention or association of churches.  Thus, a plan "established" by an organization "controlled by or associated with" a church would not be a "Church Plan" because it was not "established" by a church or a convention or association of churches.

44.     Further, this "pension board" clarification has no bearing on plans that were not "maintained" by a church pension board.  Thus, even if a plan were "established" by a church, and even if it were "maintained by" an organization "controlled by or associated with" a church, such as a school, hospital, senior living facility, or publishing company, it still would not be a "Church Plan" if the principal purpose of the organization was *other than* the administration or funding of the plan.  In such cases, the plan is "maintained" by the school, hospital, senior living facility, or publishing company, and usually through the human resources department of such entity. It is not maintained by a church pension board:  No "organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits" maintains the plan.  *Compare with* ERISA § 3(33)(C)(i), 29 U.S.C. § 1002(33)(C)(i) (1980) (current version at 29 U.S.C. § 1002(33)(C)(i) (West 2013)).

45.     The requirements for Church Plan status under ERISA, both as originally adopted in 1974 and as amended in 1980, are, as explained above, very clear.  And there is no tension between the legislative history of the 1980 amendment and the amendment itself:  Congress enacted exactly what it wanted to enact.  Fundamental to the scheme, both as originally adopted and as fine-tuned in 1980, was that neither an "affiliate" of a

church (using the 1974 language) nor "an organization controlled by or associated with a church" (using the 1980 language) could *itself* establish a Church Plan. Its employees could be *included* in a Church Plan, but if it sponsored its own plan, that was not a Church Plan. With respect to "pension boards," the 1980 legislation simply clarified the long standing practice that churches could use their own financial organizations to manage their Church Plans.

46.     Unfortunately, in 1983, in response to a request for a private letter ruling, the Internal Revenue Service ("IRS") issued a short General Counsel Memorandum that misunderstood the statutory framework. The author incorrectly relied on the "pension board" clarification to conclude that a non-church entity could sponsor its own Church Plan as long as the plan was managed by some "organization" that was controlled by or associated with a church. This, of course, is not what the statute says nor is it what Congress intended. ERISA scholar, Norman Stein, analyzed the IRS General Counsel Memorandum in a recent article and concurred:

> The IRS position is almost certainly wrong. The position is based on a barely credible construction of the statutory language and the statutory structure, rendering the primary definition of church plan superfluous. Moreover, the IRS position implements a major policy decision—exempting non-church plans from ERISA—that Congress never considered.

Norman Stein, *An Article of Faith: The Gratuity Theory of Pensions and Faux Church Plans,* ABA Section of Labor & Emp. Law Emp. Benefits Comm. Newsl. (Summer 2014), available at

http://www.americanbar.org/content/newsletter/groups/labor_law/ebc_newsletter/14_sum_ebc_news/faith.html.

47.     In any event, the IRS mistake was then repeated, often in verbatim language, in subsequent IRS determinations and, after 1990, in DOL determinations. Under the relevant law, these private letter rulings may only be relied upon by the parties thereto, within the narrow confines of the specific facts then disclosed to the agencies, and are not binding on this Court in any event.  Moreover, the IRS and DOL interpretations of the statutory framework, as expressed in these private letter rulings, are not entitled to judicial deference because the rulings are conclusory, inconsistent and lack meaningful analysis.

## V.     FSCSC AND SAMC

### A.     FSCSC's and SAMC's Operations

#### 1.     FSCSC

48.     FSCSC is the sole corporate member of SAMC, Communities, and the following other affiliated entities: University Place, Inc., St. Jude House, Franciscan Communities, Inc., Franciscan Community Benefit Services, Franciscan Advisory Services, Inc., and St. Joseph Senior Housing, Inc., (collectively the "Affiliated Entities").

49.     FSCSC operates a network of 10 senior living communities ("SLCs") in Illinois, Indiana, Ohio and Kentucky through its Affiliated Entities, over which FSCSC has direct control.  The Affiliated Entities provide senior housing and healthcare services, including independent living, assisted living, skilled nursing, Alzheimer's/dementia care, adult day care, hospice, homecare, rehabilitation, and respite care services.

50.     FSCSC provides the Affiliated Entities, including SAMC and Communities, with all program and administrative support for their operations, including operational oversight, financial management, treasury management, information

technology, compliance, marketing, human resources, resident services, and construction and development management. As the sole corporate member of the Affiliated Entities, FSCSC appoints the boards, officers and key employees of the Affiliated Entities, including SAMC and Communities.

51.    Pursuant to criteria set forth in the Internal Revenue Code and elaborated in the Treasury Department's regulations, a controlled group includes:

> [O]ne or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if –
>
> (i)  A controlling interest in each of the organizations, except the common parent organization, is owned (directly and with the application of § 1.414(c)-4(b)(1), relating to options) by one or more of the other organizations; and
>
>  (ii)  The common parent organization owns (directly and with the application of § 1.414(c)-4(b)(1), relating to options) a controlling interest in at least one of the other organizations, excluding, in computing such controlling interest, any direct ownership interest by such other organizations.

26 C.F.R. § 1.414(c)-2(b).

52.    A "controlling interest" is defined as ownership of 80% or more of the voting stock or stock value of a corporation, or ownership of an 80% or greater profits or capital interest in a partnership. *See* 26 C.F.R. §§ 1.414(c)-2(b)(2)(i)(A) & (C).

53.    Upon information and belief, under the foregoing test, Defendant FSCSC holds a controlling interest in Defendant SAMC and Defendant Communities.

54.    At all times relevant to the Amended Complaint, Defendants FSCSC, SAMC and Communities were all under common control such that each was a member of the same controlled group within the meaning of ERISA § 4001(a)(14), 29 U.S.C. § 1301(a)(14) (collectively the "FSCSC Controlled Group").

55. The principal purpose or function of FSCSC is *not* the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches.

56. FSCSC is not a church.

57. FSCSC is not a convention of churches.

58. FSCSC is not an association of churches.

59. FSCSC is not owned by a church.

60. FSCSC does not receive funding from a church.

61. FSCSC does not claim that any church has any liability for FSCSC's debts or obligations.

62. No church has any role in the governance of FSCSC.

63. No church has any role in the maintenance of the Retirement Plan.

64. No church has any role in the administration of the Retirement Plan.

65. FSCSC does not impose any denominational requirement on its employees.

66. FSCSC has no denominational requirements for its residents or clients.

67. FSCSC does not ordain ministers or priests after completing prescribed studies.

68. FSCSC does not maintain a regular congregation or congregations.

69. FSCSC does not conduct regular religious services.

70. FSCSC does not maintain Sunday schools for religious instruction of the young.

71.     FSCSC does not maintain schools for the preparation of ministers or priests.

72.     The principle purpose of FSCSC is not to disseminate or promulgate the doctrinal code of any religion.

73.     Like other large non-profit corporations that manage and operate senior living communities, FSCSC relies heavily upon revenue bonds to raise money.

74.     FSCSC is governed by a Board of Directors that consists of nine members, all but two of whom are lay people.

75.     During the relevant time period, FSCSC was managed by Mesirow Financial Interim Management, LLC, a diversified financial services firm headquartered in Chicago, Illinois, which provides investment management, investment banking, insurance, and financial consulting services to institutional investors, public sector entities, corporations, and individuals.  Under the agreement with Mesirow, all management duties of FSCSC were delegated to Thomas J. Allison, who served as the Chief Executive Officer of FSCSC and as a member of the Board of Directors.  Mr. Allison is a founding shareholder of the law firm of Allison, Slutsky & Kennedy, P.C. Under the management agreement, which ended on September 30, 2010, Mesirow was paid $463,101 annually.

76.     Currently, FSCSC is run by a team of executive officers headed by President and Chief Executive Officer Judy Amiano.  On information and belief, all but one or two of the current corporate officers responsible for managing FSCSC are lay people.

**2.      SAMC**

77.      SAMC was incorporated under the laws of the State of Indiana in May 1970 for the purpose of constructing and operating the St. Anthony Medical Center (hereinafter "the Hospital").

78.      In about 1974, SAMC completed the construction of the Hospital in Crown Point, Indiana.  On information and belief, the construction of the Hospital was financed, in part, by tax-exempt revenue bonds issued by a public bond authority.  SAMC owned and operated the Hospital for approximately 23 years until about 1999, when SAMC sold the Hospital to Franciscan Alliance, a healthcare provider headquartered in Mishawaka, Indiana, which operates healthcare facilities in Indiana and Illinois and continues to operate the Hospital today.  On information and belief, employees of SAMC became employees of Franciscan Alliance at the time of the sale.

79.      FSCSC, as the sole corporate member of SAMC, has the power to appoint and remove directors and fill vacancies on the Board of Directors of SAMC.

80.      FSCSC has the power to appoint, remove, fill vacancies, and set and pay the compensation of the officers of SAMC.

81.      SAMC and FSCSC shared common principal corporate officers, directors and employees, and for most of the relevant time period their respective Boards had the same Chairman and Vice Chairman and their respective managements had the same President and Treasurer.

82.      During the relevant time period, on information and belief, SAMC had no employees after the sale of the Hospital to Defendant Franciscan Alliance, and FSCSC therefore is and has been the administrator of the Retirement Plan.

83.      SAMC is not a church.

84.     SAMC is not a convention of churches.

85.     SAMC is not an association of churches.

86.     SAMC is not owned by a church.

87.     SAMC does not receive funding from a church.

88.     SAMC does not claim that any church has any liability for SAMC's debts or obligations.

89.     No church has any role in the governance of SAMC.

90.     SAMC does not ordain ministers or priests after completing prescribed studies.

91.     SAMC does not maintain a regular congregation or congregations.

92.     SAMC does not conduct regular religious services.

93.     SAMC does not maintain Sunday schools for religious instruction of the young.

94.     SAMC does not maintain schools for the preparation of ministers or priests.

95.     The principle purpose of SAMC is not to disseminate or promulgate the doctrinal code of any religion.

**B.      The Retirement Plan**

**1.      The Retirement Plan was Originally Established as an ERISA Plan in 1975**

96.     Effective March 1, 1975, the Retirement Plan was established by SAMC, as a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

97.     The Retirement Plan was adopted by SAMC, as a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

98.     SAMC was the original sponsor of the Plan, as a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

99.     The Retirement Plan was established and adopted by SAMC for the benefit of employees of the participating employers: SAMC, Communities, and Holding Corp.

100.    The Retirement Plan is a non-contributory defined benefit pension plan.

101.    The Retirement Plan has three Participating Employers:  Defendants SAMC, Holding Corporation and Communities.  Defendant SAMC became a participating employer on March 1, 1975.  Defendant Communities became a participating employer though its predecessor Franciscan Homes & Community Services on March 1, 1975.  Defendant Holding Corporation became a participating employer on March 1, 1993.

102.    When the Retirement Plan was originally established by SAMC, it stated that all benefits would be provided through a group annuity contract issued by an insurer such that the benefits promised under the Retirement Plan would be fully insured by an insurance contract.

103.    The Plan was promoted by SAMC and FSCSC as a valuable supplement to personal savings to assure that the retirement years of its Plan participants would be comfortable.  SAMC and FSCSC never told participants of the Retirement Plan that the termination of the Retirement Plan might result in vested benefits already earned being reduced or cut back.  For example, until well after it was determined that the Plan was underfunded by over $32 million, SAMC and FSCSC continued to send form notices informing participants of the Retirement Plan that they would begin receiving, at age 65

(the "Normal Retirement Date" specified in the Plan Document), the full accrued monthly retirement benefit calculated under the terms of the Retirement Plan and continue receiving such benefits for as long as the participants lived.

104.    Under the terms of the Plan, an employee became eligible to participate in the Retirement Plan after performing one year or 1,000 hours of service.  Once eligible to participate in the Plan, an employee earned one year of Credited Service for each calendar year in which the employee worked 1,000 hours or more.

105.    Under the Plan, an employee with five years of Credited Service became vested in the Plan and was entitled to begin receiving a normal monthly retirement benefit at the age of 65, or, if the employee so elected, a reduced monthly benefit at the age of 55.  The normal monthly benefits under the Plan are determined based upon a formula which multiplies 1-1/4% of a participant's Average Monthly Earnings by the number of years of Credited Service.  Thus the more years of Credited Service a participant worked and the higher the participant's Average Monthly Earnings, the greater the benefit he or she would receive under the Plan.

106.    An early Summary Plan Description of the Plan, which was distributed to participants of the Plan (the "SPD"), informed participants that all assets of the Retirement Plan would be held in a separate annuity contract with Traveler's Insurance Company and that, if the Plan was ever terminated, vested participants would receive a deferred insured annuity contract for the full amount of the benefits accrued under the Retirement Plan with payments beginning at normal retirement age.

107.    The SPD also assured participants that the Retirement Plan was subject to ERISA, that all benefits under the Retirement Plan were insured under the Pension

Benefit Guarantee Corporation ("PBGC"), and that, if the Retirement Plan was terminated, the payment of vested benefits would come from the Retirement Plan assets or the PBGC.

**2.  The Retirement Plan Seeks Church Plan Status in 1989**

108.  Several years after participants were assured that the Retirement Plan was subject to ERISA and that the benefits under the Plan were guaranteed by the PBGC, a private letter ruling was sought on June 13, 1989 from the Internal Revenue Service that the Retirement Plan qualified as a Church Plan and was therefore exempt from many of the requirements of ERISA, including the funding requirements and the obligation to pay premiums to the PBGC to guarantee a certain level of benefits in the event the Plan was terminated.

109.  In the application for the private letter ruling, it was represented to the IRS, among other things, that SAMC was controlled by FSCSC.

110.  In the application for the private letter ruling, it was also represented to the IRS that all three organizations that purportedly had employees in the Plan were not-for-profit corporations that were exempt from federal income taxation under section 501(c)(3) of the Code.

111.  Although the Retirement Plan does not meet the definition of a Church Plan because, among other things, it is not sponsored by a church or by a convention or association of churches, in an undated letter, the IRS nevertheless issued a private letter ruling stating that the Retirement Plan qualified as a Church Plan as of March 1, 1975.  In reaching this conclusion, the IRS incorrectly concluded that, although the Plan was sponsored by SAMC, a non-church entity, the Plan still qualified as a Church Plan

because it was managed by the Retirement Committee, which was controlled by SAMC and FSCSC, which were themselves controlled by the Catholic Church.

112.    Upon information and belief, receipt of this private letter ruling was not shared with plan participants.  Neither the Plaintiffs nor the other participants of the Plan were informed that, because the Retirement Plan qualified as a Church Plan, the Plan was no longer subject to the protections afforded by ERISA, including the funding requirements. Nor were they informed that the Retirement Plan was no longer insured.

**3.    The Conversion of the Retirement Plan from an Insured Annuity Plan to a Trusteed Plan in 1995**

113.    As of February 1, 1995, assets of the Retirement Fund were transferred to Traveler's to entirely fund, through group annuity contracts, the benefits and future cost of living increases for all participants who retired prior to March 1, 1995.

114.    Under the terms of the Plan, Plaintiffs were assured that, at the time of their retirement, a lifetime annuity contract would be purchased for them and the future amendment or termination of the Retirement Plan would not adversely affect the vested benefits which they had already accrued (the "Insured Annuity Plan").

115.    As of March 1, 1995, Bank One (later J.P. Morgan Chase) became the Trustee for the Retirement Plan and all participants who retired or terminated on or after March 1, 1995 received their retirement benefits and cost of living increases from the Bank One trust.

116.    When the Plan converted from an insured annuity plan to a plan funded through a trust ("the Trusteed Plan"), Plaintiffs then had to rely upon SAMC's and the Participating Employers' continued solvency and continued contributions to the

Retirement Plan, as well as the investment performance of the Trust, in order for the Retirement Plan to have sufficient assets to meet expected benefits payment obligations.

**4.    The Sale of St. Anthony Hospital and Freezing of the Retirement Plan in 1998 and 1999**

117.    On information and belief, beginning in about 1998, FSCSC decided to get out of the business of operating a hospital and to focus its business activities exclusively on creating and operating senior living communities and providing related living and healthcare services to seniors in Illinois, Indiana, Kentucky and Ohio – activities which it planned to finance, in part, with the proceeds from the sale of the Hospital.

118.    In 1999, the Hospital was sold to Franciscan Alliance.

119.    The sale took the form of an asset sale agreement whereby Franciscan Alliance acquired all of the physical assets of the Hospital.

120.    On information and belief, the purchase price of the Hospital assets was approximately $150 million in cash, which was financed by $150 million in hospital revenue bonds issued by the Indiana Health Facility Financing Authority.

121.    After the acquisition of the Hospital by Franciscan Alliance, the Hospital continued doing business as St. Anthony Medical Center, employing most of the same employees who had previously been employed by the Hospital when it was owned and operated by SAMC and FSCSC.

122.    On information and belief, following the sale of the Hospital, a significant portion of the proceeds from the sale was upstreamed from SAMC to FSCSC and used by FSCSC to fund the construction and operation of new senior living communities which FSCSC continues to own and operate through its Affiliated Entities.

123.    Following the sale, SAMC and FSCSC continued to maintain and administer the Retirement Plan and, along with the other Participating Employers, were responsible for its operating expenses and funding requirements.

124.    On June 30, 1998, shortly before the sale of the Hospital, SAMC and FSCSC declared that the Retirement Plan was frozen with respect to all employees of the Hospital, such that benefit accruals under the Retirement Plan ceased as of that date.  The benefits with respect to other participants of the Retirement Plan who were nursing home employees were frozen as of December 31, 1996.  As a result, participants in the Retirement Plan did not thereafter accrue any additional benefits under the Plan.  However, the Plaintiffs and all other similarly situated members of the Class who were participants in the Plan at the time the Hospital was sold, remained entitled, upon reaching retirement age, to receive accrued pension benefits as defined under the Plan based on service performed prior to June 30, 1998.

**5.    The Operation of the Plan**

125.    On information and belief, the Retirement Plan was fully funded when it was frozen in 1998.

126.    SAMC was authorized under the terms of the Plan to terminate the Plan at any time and to provide the vested accrued benefits to all participants and beneficiaries of the Plan by purchasing individual or group annuity contracts.

127.    Although the Plan required that the Employers make contributions to the Plan in accordance with the Funding Policy, contrary to the requirements of ERISA as set forth below, the Plan document does not require funding of accrued benefits at termination, but only requires that the assets of the plan be available to provide benefits to be allocated among participants.

128. However, under the Plan document no amendment terminating the Plan would be effective to the extent that it has the effect of decreasing a participant's accrued benefit.

129. On information and belief, after the sale of the Hospital, SAMC and FSCSC could have terminated the Retirement Plan and, with a portion of the proceeds from the sale, made adequate contributions to the Retirement Plan to purchase group annuity contracts or immediately distribute to the participants of the Plan a lump sum of 100% of the actuarial equivalent value of the accrued benefits due to each participant under the terms of the Plan.

130. Instead, the frozen Retirement Plan continued to be maintained and administered by SAMC, FSCSC, and the SAMC Retirement Committee. Over time, insufficient assets were retained and held in trust by the Trustees, Bank One and later J.P. Morgan and MetLife, to meet the expected benefit payments to Plaintiffs and members of the Class under the Retirement Plan.

131. After the sale, the Retirement Plan had two potential funding sources: (i) contributions from the Participating Employers, and (ii) the investment performance of the assets of the Retirement Plan.

132. To adequately fund the Plan, SAMC and FSCSC were required to establish a funding policy and method so that the investments of the Plan could be appropriately coordinated with the Plan's financial needs (such as the requirements for liquidity and investment performance to meet expected benefit payments) both on a short and long-term basis (the "Funding Policy").

133.    Pursuant to the terms of the Plan, Participating Employers were required to make contributions to the Retirement Plan pursuant to: (i) the Funding Policy, and (ii) the annual actuarial valuation of the Retirement Plan made by an enrolled actuary.

134.    On information and belief, no Funding Policy was established or implemented in order to assure that the contributions of the Participating Employers and investment performance of the Plan were adequate to meet the expected benefit payments.

135.    In the absence of such a Funding Policy, the Participating Employers made insufficient contributions to the Retirement Plan to meet the expected benefits payments under the Retirement Plan such that, as described below, between 2002 and 2011, the Plan became underfunded by over $32 million.

136.    As of June 30, 2002 (the end of fiscal year 2001), SAMC reported on its exempt organization tax return that the Company had net assets of $2,244,433 and no liabilities relating to the funding of the Retirement Plan.  As of June 30, 2003 (the end of fiscal year 2002), SAMC reported on its exempt organization tax return that the Company had net assets of $1,828,465 and no liabilities for the Retirement Plan.

137.    As of June 30, 2004 (the end of fiscal year 2003), however, SAMC reported on its exempt organization tax return that the Company had incurred $13.9 million in liabilities during fiscal year 2003 and that the Company had negative assets of $12,077,697.  Most of this dramatic change in the Company's net assets was attributable to a $12,924,132 "adjustment" taken by SAMC for liability relating to the funding of the Retirement Plan.  Of that amount, $8,466,980 related to a "Prior Fiscal Year Adjustment

to Pension Liability for Accumulated Benefit" and $4,457,152 related to a "Current Year Adjustment for Accumulated Benefit."

138.    By June 30, 2005 (the end of fiscal year 2004), SAMC's liability for funding of the Retirement Plan had grown to $22,563,519 and the Company reported net assets of negative $22,563,519.

139.    As of June 30, 2009 (the end of fiscal year 2008), SAMC reported an "Unfunded Pension Fund Obligation" pertaining to the Retirement Plan of $25,759,215 and net assets of negative $25,759,215.

140.    As of June 30, 2010 (the end of fiscal year 2009), SAMC reported an "Unfunded Pension Fund Obligation" pertaining to the Retirement Plan of $35,219,451.

141.    As of June 30, 2011 (the end of fiscal year 2010), the Retirement Plan was underfunded by $32,208,020.

142.    Even though the Plan had been substantially underfunded for a period of at least seven years and had insufficient assets to provide the promised benefits which participants of the Retirement Plan had accrued, SAMC and FSCSC continued to inform participants of the Plan that when they reached retirement age they would be eligible to receive their full pension benefits under the Retirement Plan.

143.    The underfunding of the Retirement Plan was not disclosed to the Plaintiffs until May 2012, when SAMC and FSCSC prepared a letter stating that the Plan would be terminated.

**6.    The Purported Termination of the Retirement Plan in 2012**

144.    Because the Plan was grossly underfunded, SAMC and FSCSC declared that the Plan was terminated.

145.     All participants of the Plan lost a substantial portion of their vested accrued pension benefits promised under the Retirement Plan.

146.     As explained below, the monthly pension checks of participants were cut by 40% and lump sum pension payments were cut by 30%.

147.     On March 6, 2012, the Plan was purportedly amended in order to effectuate the termination of the Plan effective March 31, 2012.

148.     In May 2012, SAMC sent a memo to the Plaintiffs and other participants of the Retirement Plan informing them that the Plan had insufficient assets to meet its benefit obligations and was therefore being terminated.

149.     Effective March 31, 2012 (the "Termination Date"), the Fifth Amendment to the Retirement Plan (the "Fifth Plan Amendment") was adopted by SAMC pursuant to which the Retirement Plan was terminated and a benefit reduction was approved by which the accrued benefits of all participants under the Plan were reduced by 30% and the benefits of any participant electing an annuity form of payment were reduced by an additional 10%.

150.     Under the express terms of the Plan, the Fifth Amendment was not effective to the extent that it had the effect of decreasing a participant's accrued benefit.

151.     In a memorandum dated April 30, 2012, but not sent to Plan participants until sometime in May 2012, the Plan Administration Committee stated, in pertinent part, as follows:

> The St. Anthony Medical Center, Inc. Retirement Plan (the "Plan"), which is sponsored by SAMC, Inc., has been under review by the Plan Administration Committee and counsel for some period of time.  A decision was made to freeze further benefit accruals under the Plan in the late 1990s.  The Plan is under-funded, which means that the

> Plan's assets are not sufficient to provide participants with
> 100% of individual Plan benefits. As such, the very
> difficult decision has been made to terminate the Plan.

152.    The April 30, 2012 memorandum informed participants of the Retirement

Plan that they would soon receive documents outlining the options for distributions of

Plan benefits and that those options would include either "a single sum payment,

continuation of your current form of payment (if you are currently receiving payments),

and various annuity options."

153.    On or after May 4, 2012, the participants received a second memorandum

from the Plan Administration Committee stating that "[a]s a result of the Plan's

underfunding, the benefits of all participants have been reduced. An additional reduction

also applies to participants who elect to receive (or continue receiving) an annuity form

of payment."

154.    Along with the May 4, 2012 memorandum, participants of the Retirement

Plan received a document entitled "Distribution Request Form – Plan Termination,"

which estimated the participants' benefits upon termination. An accompanying Summary

of Payment Options explained to participants, among other things, that estimated benefits

"reflect (i) an approximate 30% reduction in [] accrued benefit, and (ii) an additional

10% reduction for all annuity forms of payment, since annuities are more costly to

provide than single sum payments."

155.    Following the declared termination, each of the Plaintiffs received pension

benefits which were substantially less than the actuarial equivalent of the pension benefits

which they had been promised and had accrued under the Plan.

156.    On information and belief, prior to the purported March 31, 2012

Termination Date, Defendants, did not meet any of the following distress termination

criteria in that they were not: (i) in a liquidation proceeding under federal bankruptcy law; (ii) in a reorganization proceeding under federal bankruptcy law; (iii) unable to pay their debts when due; and (iv) the cost of providing pension coverage had not become unreasonably burdensome due solely to the decline in the workforce covered by the controlled group members' pension plans.

157.    FSCSC and/or SAMC as the Plan Administrator did not issue a notice of intent to terminate to each affected party in accordance with 29 C.F.R. § 4041.42 at least 60 days and not more than 90 days before the proposed termination date of March 31, 2012.

158.    FSCSC and/or SAMC as Plan Administrator did not file a distress termination notice with the PBGC in accordance with 29 C.F.R. § 4041.45 no later than 120 days after the proposed termination date of March 31, 2012.

159.    The PBGC did not determine that each contributing sponsor and each member of its controlled group satisfied one of the distress criteria set forth in 29 C.F. R. § 4041.41(c).

**7.    The Impact of the Declared Termination upon Plaintiffs**

160.    The Plaintiffs and other members of the Class understood that, as part of their employment with SAMC, they would receive the full amount of their vested benefits which they had accrued prior to the sale of the Hospital, in the form of an insured annuity.  Defendants reneged on their promise to Plaintiffs and other members of the Class to provide insured annuities and, by their mismanagement of the Plan and its assets over a 13-year period following the sale, caused Plaintiffs and other members of the Class to lose thousands of dollars in benefits without disclosing such losses until after SAMC and FSCSC declared that the Retirement Plan was terminated.

161.     Plaintiff Owens, who began working as a medical transcriptionist at St. Anthony on June 9, 1976, when she was 31 years of age, was informed in January 2000 that she would become eligible for early retirement on May 1, 2000, at the age of 55, or for regular retirement on May 1, 2010, at the age of 65.  Owens was promised a "Life Only" benefit of $270.82 if she chose early retirement at age 55 and of $541.63 if she waited until age 65, normal retirement age, to retire.

162.     Owens declined the offer of early retirement and continued to work for ten more years, until she reached 65 years of age, at which time she commenced receiving a "Straight Life Annuity" in the amount of $541.63 beginning on May 1, 2010.

163.     On May 4, 2012, SAMC informed Owens that as a result of the Retirement Plan's underfunding she could select one of two reduced payment options: (i) a "Single Sum" of $44,647.04, or (ii) a "Continued Current Option (Single Lifetime Annuity)" of $341.23 per month.

164.     The Single Lifetime Annuity option represented a thirty-seven (37) percent reduction from the $541.63 monthly Single Lifetime Annuity that she was receiving at that time.

165.     Owens chose the Single Sum option.  On information and belief, the Single Sum option Owens chose represented approximately a thirty (30) percent reduction, or more than $19,000, in the actuarial equivalent value of the pension benefit she was entitled to receive under the Plan prior to the March 2012 amendment.

166.     Plaintiff Jewett, who began working at St. Anthony on May 24, 1975, when she was 26 years of age, retired on October 19, 2006, at the age of 57, after 31

years of service.  Jewett commenced receiving a monthly "Life Only" early retirement benefit of $325.37 per month, commencing on January 1, 2007.

167.    In connection with the termination of the Plan, Jewett was offered two reduced payment options: (i) a "Single Sum" of $28,660.63, or (ii) a "Continued Current Option (Single Lifetime Annuity)" of $205.17 per month.

168.    The Single Lifetime Annuity option represented a thirty-seven (37) percent reduction from the $325.37 monthly Single Lifetime Annuity that she was then receiving.

169.    Jewett chose the Single Sum option.  On information and belief, the Single Sum option Jewett chose represented approximately a thirty (30) percent reduction, or more than $12,000, in the actuarial equivalent value of the pension benefit she was entitled to receive under the Plan prior to the March 2012 amendment.

170.    Plaintiff Buksar, who began working as a nurse at St. Anthony in 1980, has been continually employed by the Hospital for more than 34 years.

171.    One of the principal reasons that Buksar decided to work at the Hospital was the retirement benefits promised under the Retirement Plan.

172.    In about 1999, when Franciscan Alliance purchased the Hospital, Buksar was assured that the pension she had earned as of that date was safe and that money to pay her retirement benefits would always be there.

173.    In April 2012, Buksar was informed by SAMC and FSCSC that the Plan was underfunded and was offered two reduced payment options under the Retirement Plan: (i) a "Single Sum" buy out, or (ii) a lifetime annuity at regular retirement age.

174.     Buksar chose the Single Sum option.  On information and belief, the Single Sum option Buksar chose represented approximately a thirty (30) percent reduction in the actuarial equivalent value of the pension benefit that she was entitled to receive under the Plan prior to the March 2012 amendment.

175.     Plaintiff Snyder began work as a nurse at St. Anthony on June 1, 1981, and separated from the Hospital 23 years later on May 13, 2004, at the age of 57.  At the time of her separation, Snyder was informed that she could immediately begin to receive a lifetime pension benefit of $414.21 per month if she elected to take an early retirement or she could receive $720.37 per month if she waited until the age of 65, the normal retirement age.

176.     Snyder elected to wait until her normal retirement date to begin receiving pension benefits.

177.     On February 9, 2012, Snyder received a Retirement Notification from the St. Anthony Medical Center, Inc. Retirement Plan (Franciscan Sisters of Chicago) informing her that she was entitled to submit an Application for Retirement Benefits commencing on July 7, 2012 in the form of a "Life-Only Annuity in the amount of $720.37 per month" or a "Qualified Joint and 50% Survivor Annuity in the amount of $679.38 per month."

178.     On April 21, 2012, Snyder submitted an application for retirement benefits and elected to begin receiving a Life-Only Annuity retirement benefits in the amount of $720.37 per month.

179.     Nine days after submitting her application, it was announced that the Retirement Plan was being terminated.  Snyder was thereafter offered two reduced

payment options: (i) a lump sum payment of $58,277.58, or (ii) a Single Life Annuity of $425.98 per month.

180.     The $425.98 Single Life Annuity option represented a forty (40) percent reduction from the $720.37 monthly Life-Only Annuity she was entitled to receive and was promised under the Plan prior to the March 2012 amendment.

181.     Snyder chose the Single Sum option.  On information and belief, the Single Sum option that Snyder chose represented approximately a thirty (30) percent reduction or approximately $25,000 in the actuarial equivalent value of the Single-Life Annuity pension benefit she was entitled to receive under the Plan prior to the March 2012 amendment.

**8.     The Retirement Plan Meets the Definition of an ERISA Defined Benefit Plan**

182.     The Retirement Plan is a plan, fund or program that was established or maintained by FSCSC and SAMC and, by its express terms and surrounding circumstances, provided retirement income to employees, and as such meets the definition of "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

183.     The Retirement Plan does not provide for an individual account for each participant and does not provide benefits solely based upon the amount contributed to a participant's account.  As such, the Retirement Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35), and is not an individual account plan or a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

9.    **FSCSC and SAMC were the Plan Sponsors of the Retirement Plan
and all Defendants were Fiduciaries of the Retirement Plan**

184.    As employers establishing and/or maintaining the Retirement Plan,
Defendants SAMC and FSCSC were the Plan Sponsors of the Retirement Plan within the
meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

185.    Defendants SAMC and FSCSC were also the Plan Administrators of the
Retirement Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).  As
such, Defendants SAMC and FSCSC were fiduciaries with respect to the Plan within the
meaning of ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii), because the Plan
Administrator, by the very nature of the position, has discretionary authority or
responsibility in the administration of the Plan.

186.    Defendants SAMC and FSCSC were also fiduciaries with respect to the
Retirement Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because
they exercised discretionary authority or discretionary control respecting management of
the Retirement Plan, exercised authority and control respecting management or
disposition of the Retirement Plan's assets, and/or had discretionary authority or
discretionary responsibility in the administration of the Retirement Plan.

187.    Additionally, under the Plan, SAMC appointed the members of the SAMC
Retirement Committee, thereby assuming the ERISA fiduciary duties of an appointing
fiduciary under 29 C.F.R. § 2509.75-8(D-4) to monitor and supervise the members of the
Retirement Committee.  As such, SAMC was a monitoring fiduciary within the meaning
ERISA § 3(21), 29 U.S.C. § 1002(21), because it exercised discretionary authority or
discretionary control respecting management of the Retirement Plan, exercised authority
and control respecting management or disposition of the Retirement Plan's assets, and/or

had discretionary authority or discretionary responsibility in the administration of the Retirement Plan.

188.     On information and belief, FSCSC, as the sole corporate member of SAMC, through the Members of the FSCSC Board of Directors appointed the members of the Board of SAMC as well as the members of the Retirement Committee and controlled the operations of SAMC, thereby assuming the duties of an appointing fiduciary under 29 C.F.R. § 2509.75-8(D-4) to monitor and supervise SAMC and the Retirement Committee.  As such, FSCSC and the Members of the FSCSC Board of Directors were monitoring fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because they exercised discretionary authority or discretionary control respecting management of the Retirement Plan, exercised authority and control respecting management or disposition of the Retirement Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Retirement Plan.

189.     The terms of the instrument under which the Retirement Plan was operated specifically designated the SAMC Retirement Committee as the Plan Administrator within the meaning of ERISA § 3(16)(A)(i), 29 U.S.C. § 1002(16)(A)(i), sufficient to meet the requirements of ERISA § 402, 29 U.S.C. § 1102.  As such, the Defendant members of the Retirement Committee and the Retirement Committee are and have been fiduciaries with respect to the SAMC Plan within the meaning of ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii), because the persons administering the Plan, by the very nature of their positions, have discretionary authority or responsibility in the administration of the Plan.

190.     Defendant Donna Gosciej, as Vice President of Human Resources for FSCSC, is also a fiduciary with respect to the Retirement Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because, upon information and belief, she exercised discretionary authority or discretionary control respecting management of the Retirement Plan, exercised authority and control respecting management or disposition of the Retirement Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Retirement Plan.

191.     Defendant Linda Hornyak as the Manager of Compensation and Benefits for FSCSC is also a fiduciary with respect to the Retirement Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because, upon information and belief, she exercised discretionary authority or discretionary control respecting management of the Retirement Plan, exercised authority and control respecting management or disposition of the Retirement Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Retirement Plan.

**10.     The Retirement Plan Is Not a Church Plan**

192.     SAMC and FSCSC claim that the Retirement Plan is a Church Plan under ERISA § 3(33), 29 U.S.C. § 1002(33), and the analogous section of the Internal Revenue Code ("IRC"), and is therefore exempt from ERISA's coverage under ERISA § 4(b)(2), 29 U.S.C. § 1003(b)(2).

**a.     Only Two Types of Plans May Qualify as a Church Plan and the Retirement Plan is Neither**

193.     Under section 3(33) of ERISA, 29 U.S.C. § 1002(33), *only the following two types* of plans may qualify as a Church Plan:

- <u>First</u>, under section 3(33)(A) of ERISA, 29 U.S.C. § 1002(33)(A), a plan *established and maintained* by a church or convention or association of churches can qualify under certain circumstances and subject to the restrictions of section 3(33)(B) of ERISA, 29 U.S.C. § 1002(33)(B); and

- <u>Second</u>, under section 3(33)(C)(i) of ERISA, 29 U.S.C. § 1002(33)(C)(i), a plan *established* by a church or by a convention or association of churches that is *maintained* by an organization, *the principal purpose or function of which* is the administration or funding of a retirement plan, if such organization is controlled by or associated with a church or convention or association of churches, can qualify under certain circumstances and subject to the restrictions of section 3(33)(B) of ERISA, 29 U.S.C. § 1002(33)(B).

Both types of plans must be "established" by a church or by a convention or association of churches in order to qualify as a "Church Plan."

194.    Although other portions of ERISA § 3(33)(C) address, among other matters, who can be *participants* in Church Plans—in other words, which employees can be in Church Plans, etc.—these other portions of ERISA § 3(33)(C) do not allow any other type of *plan* to be a Church Plan.  29 U.S.C. § 1002(33)(C).  The only two types of plans that can qualify as a Church Plan are those described in ERISA § 3(33)(A) and in § 3(33)(C)(i).  29 U.S.C. §§ 1002(33)(A) and (C)(i).  The Retirement Plan does not qualify as a Church Plan under either ERISA § 3(33)(A) or § 3(33)(C)(i).  29 U.S.C. §§ 1002(33)(A) or (C)(i).

195.    First, under ERISA § 3(33)(A), a Church Plan is "a plan established and maintained . . . for its employees (or their beneficiaries) by a church or by a convention or

association of churches which is exempt from tax under section 501 of title 26." ERISA § 3(33)(A), 29 U.S.C. § 1002(33)(A).

196.    The Retirement Plan at issue here is not a Church Plan as defined in ERISA § 3(33)(A), 29 U.S.C. § 1002(33)(A), because the Retirement Plan was established and maintained by SAMC and FSCSC for the employees of Participating Employers, including employees of Defendants SAMC, Communities, and the for-profit Holding Corporation. Neither SAMC or FSCSC are a church or a convention or association of churches, nor do they claim to be.

197.    IRS Form 990 asks the filing organization to state whether it is, *inter alia*, a church, a school, a hospital, or an organization operated for the benefit of publicly supported organizations.

198.    Between 2009 and 2012, SAMC did not identify as a church on IRS Form 990 filings.

199.    Between 2009 and 2012, FSCSC did not identify as a church on IRS Form 990 filings.

200.    Pursuant to SAMC's and FSCSC's own sworn statements to the IRS in the Form 990, they are not churches.

201.    Accordingly, the Retirement Plan was not "established and maintained by" a church or by a convention or association of churches and was not maintained for employees of any church or convention or association of churches. That is the end of the inquiry under ERISA § 3(33)(A), 29 U.S.C. § 1002(33)(A).

202.    Section 3(33)(B) of ERISA, 29 U.S.C. § 1002(33)(B) further provides that a Church Plan does not include a plan (i) established and maintained for the benefit

of employees of a church or convention or association of churches who are employed in one or more unrelated trades or businesses, or (ii) if less than substantially all the individuals in the plan are employees of a tax-exempt organization that is controlled by or associated with a church or association of churches.

203.     Thus,  even if the Retirement Plan was established and maintained by a church or a convention or association of churches, it would still not qualify as a Church Plan because (i) the Retirement Plan was maintained for the benefit of employees of Holding Corporation that were employed in connection with a for-profit trade or business, and (ii) on information and belief, less than substantially all the individuals included in the Retirement Plan were employees of tax-exempt organizations controlled by or associated with a church.  ERISA § 3(33)(B), 29 U.S.C. § 1002(33)(B).

204.     Second, under ERISA § 3(33)(C)(i), a Church Plan may be a plan "established" by a church or by a convention or association of churches that is "maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches." ERISA § 3(33)(C)(i), 29 U.S.C. § 1002(33)(C)(i).

205.     The Retirement Plan is not a Church Plan as defined in ERISA § 3(33)(C)(i), 29 U.S.C. § 1002(33)(C)(i), because the Retirement Plan was not "established" by a church or by a convention or association of churches.  Moreover, the Retirement Plan does not qualify as a "Church Plan" under section 3(33)(C)(i) because it

was maintained by SAMC and FSCSC, whose principal purpose or function is not the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both. Instead, the principal purpose of SAMC was to operate a hospital (until the Hospital was sold) and the principal purpose of FSCSC was to manage the operation of a hospital (until the Hospital was sold) and a network of senior living communities owned by its Affiliated Entities. This ends any argument that the Retirement Plan could be a Church Plan under ERISA § 3(33)(C)(i), 29 U.S.C. § 1002(33)(C)(i).

206.     To the extent that SAMC and FSCSC claim that the Retirement Plan qualifies as a "Church Plan" under section 3(33)(C)(i) because it is "maintained" by an entity within SAMC and/or FSCSC, whose principal purpose or function is the administration or funding of the plan or program for the provision of retirement benefits or welfare benefits, the claim fails because the only entities with the power to "maintain" the Retirement Plan pursuant to the Plan, which includes the power to continue and/or terminate the Retirement Plan, are SAMC and/or FSCSC. The claim also fails because if all that is required for a plan to qualify as a Church Plan is that it meets section 3(33)(C)(i)'s requirement that it be maintained by a church-associated organization, there would be no purpose for section 3(33)(A), which defines a Church Plan as one established and maintained by a church. This ends any argument that the Retirement Plan could be a Church Plan under ERISA § 3(33)(C)(i), 29 U.S.C. § 1002(33)(C)(i), because it is maintained by an entity other than SAMC and/or FSCSC.

207.     However, even *if* the Retirement Plan had been "established" by a church and even *if* the principal purpose or function of SAMC and/or FSCSC *was* the

administration or funding of the Retirement Plan, the Retirement Plan *still* would not qualify as a Church Plan under ERISA § 3(33)(C)(i), 29 U.S.C. § 1002(33)(C)(i), because the principal purpose of the Plan is not to provide retirement or welfare benefits *to employees of a church or convention or association of churches*. The more than 1,900 participants in the Retirement Plan included employees who worked for the Hospital, a non-profit hospital; St. Anthony Home, a nursing home owned by Communities, an Affiliated Entity of FSCSC; and the Holy Family Child Care Center. Upon information and belief, the Plan also included employees of a for-profit entity, Holding Corporation. The Hospital, St. Anthony Home, Holy Family Child Care Center, and Holding Corporation are not churches or conventions or associations of churches, and their employees are not employees of a church or a convention or association of churches.

208.     Under ERISA § 3(33)(C)(ii), 29 U.S.C. § 1002(33)(C)(ii), however, an employee of a tax-exempt organization that is controlled by or associated with a church or a convention or association of churches may also be considered an employee of a church. This part of the definition merely explains which employees a church may cover *once a valid Church Plan is established*. The Retirement Plan also fails this part of the definition because SAMC and FSCSC are not controlled by or associated with a church or a convention or association of churches within the meaning of ERISA.

209.     SAMC and FSCSC are not controlled by a church or convention of churches.

210.     Neither SAMC nor FSCSC is owned or operated by a church and neither receives funding from a church.

211.     In addition, neither SAMC nor FSCSC is "associated with" a church or a convention or association of churches within the meaning of ERISA § 3(33)(C)(i), 29 U.S.C. § 1002(33)(C)(i).  Under ERISA § 3(33)(C)(iv), 29 U.S.C. § 1002(33)(C)(iv), an organization "is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches."

212.     Neither SAMC nor FSCSC share common religious bonds and convictions with a church or a convention or association of churches within the meaning of ERISA because (1) a church plays no role in their governance, (2) SAMC and FSCSC receive no financial support from a church, (3) no religious denominational requirement exists for the employees of SAMC or FSCSC, and (4) SAMC provided services to patients without regard to their religious affiliation, and FSCSC provides services to seniors without regard to their religious affiliation and encourages divergent spiritual views by such seniors.

213.     The Retirement Plan further fails to satisfy the requirements of ERISA § 3(33)(C)(i) because this section requires the organization that maintains the plan to be "controlled by or associated with" a church or a convention or associations of churches within the meaning of ERISA.  29 U.S.C. § 1002(33)(C)(i).  Thus, even if (1) a church had "established" the Retirement Plan (which it did not), (2) the principal purpose or function of SAMC and/or FSCSC was the administration and funding of the Retirement Plan (instead of running a hospital system or a network of senior living communities), and (3) the participants of the Retirement Plan were employees of a church or a convention or association of churches (which they are not), the Retirement Plan still

would not qualify as a Church Plan under ERISA § 33(C)(i) because – for the reasons outlined above – neither SAMC nor FSCSC is *controlled by or associated with* a church or a convention or association of churches within the meaning of ERISA.  29 U.S.C. § 1002(33)(C)(i).

214.    Finally, even if SAMC and/or FSCSC were "controlled by or associated with" a church and thus SAMC's employees or the employees of the various Participating Employers were deemed "employees" of a church under ERISA § 3(33)(C)(ii)(2), and even if the Retirement Plan was "maintained by" either a church or "pension board" satisfying the requirements of ERISA § 3(33)(C)(i), the Retirement Plan would still not be a "Church Plan" because *all* "Church Plans" must be "established" by a church or by a convention or association of churches.  29 U.S.C. §§ 1002(33)(A) and (C)(i).  Although a church may be deemed an "employer" of the employees of the organization that it "controls" or with which it is "associated," *see* ERISA § 3(33)(C)(iii), 29 U.S.C. § 1002(33)(C)(iii), nothing in ERISA provides that the church may be deemed to have "established" a retirement plan that was in fact established by the "controlled" or "associated" organization.  Accordingly, because the Retirement Plan was established by SAMC and/or FSCSC, the Plan cannot be a "Church Plan" within the meaning of ERISA.

b.    **Even if the Retirement Plan Could Otherwise Qualify as a Church Plan under ERISA §§ 3(33)(A) or (C)(i), it is Excluded From Church Plan Status under ERISA § 3(33)(B)(ii)**

215.    Under ERISA § 3(33)(B)(ii), 29 U.S.C. § 1002(33)(B)(ii), a plan is specifically excluded from Church Plan status if less than substantially all of the plan participants are members of the clergy or employed by an organization controlled by or associated with a church or a convention or association of churches.  In this case, there are approximately 1,900 participants in the Retirement Plan and nearly all of them are or

were non-clergy workers providing healthcare services, senior living services, day care services, or other services to the non-profit and for profit Participating Employers in the Plan.

216.    If the Retirement Plan participants did not work for an organization that is controlled by or associated with a church or a convention or association of churches, then even if the Retirement Plan could otherwise qualify as a Church Plan under ERISA § 3(33)(A), 29 U.S.C. § 1002(33)(A), it still would be foreclosed from Church Plan status under ERISA § 3(33)(B)(ii), 29 U.S.C. § 1002(33)(B)(ii).

217.    As set forth above, SAMC and FSCSC were not controlled by a church or a convention or association of churches, nor did they share common religious bonds and convictions with a church or a convention or association of churches.

**c.      Even if the Retirement Plan Could Otherwise Qualify as a Church Plan under ERISA, the Church Plan Exemption, as Claimed by SAMC and FSCSC, Violates the Establishment Clause of the First Amendment of the Constitution and Is Therefore Void and Ineffective**

218.    The Church Plan exemption is an accommodation *for churches* that establish and maintain pension plans and it allows such plans to be exempt from ERISA.

219.    The Establishment Clause guards against the establishment of religion by the government.  The government "establishes religion" when, among other activities, it privileges those with religious beliefs (e.g., exempts them from neutral regulations) at the expense of non-adherents and/or while imposing legal and other burdens on non-members.  Extension of the Church Plan exemption to SAMC and/or FSCSC, non-church entities, privileges SAMC and/or FSCSC for their claimed faith at the expense of their employees, who are told that their faith is not relevant to their employment, yet who are then denied the benefit of insured, funded pensions, as well as many other important

ERISA protections. Similarly, SAMC and/or FSCSC, as non-church entities, have a privileged economic advantage, based solely on their claimed religious beliefs, over their competitors in the commercial arena they have chosen. This too is prohibited by the Establishment Clause. Simply put, when government provides a regulatory exemption "exclusively to religious organizations that is not required by the Free Exercise Clause and that . . . burdens nonbeneficiaries," it has endorsed religion in violation of the Establishment Clause. *See, e.g.*, *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15, 18 n.8 (1989) (plurality opinion).

220.    As set forth in more detail in Count XIV below, the extension of that accommodation to SAMC and/or FSCSC, neither of which is a church, violates the Establishment Clause because it is not necessary to further the stated purposes of the exemption, harms the employees of SAMC and/or FSCSC, puts SAMC and/or FSCSC competitors at an economic disadvantage by requiring that they comply with ERISA and adequately fund their defined benefit pension plans, and relieves SAMC and/or FSCSC of no genuine religious burden created by ERISA. Accordingly, the Church Plan exemption, as claimed by SAMC and FSCSC with respect to the Retirement Plan, is void and ineffective.

**11.    The Defendants Engaged in Fraud and Concealment of the True Financial Condition of the Plan**

221.    The Defendants uniformly withheld information from participants regarding the fact that promised benefits under the Plan were not secure or insured, and that there was a substantial likelihood that the participants would not receive the full amount of their accrued benefits. The Defendants did so by, among other things, hiding

from the participants and/or misrepresenting to the participants the significance of the following facts:

a)  That as a consequence of receiving a favorable private letter ruling from the IRS that the Plan qualified as a Church Plan many of the protections applicable to an ERISA-covered Plan which the participants were promised would not apply to the Plan, including that the Plan would no longer:

    i)  be required to comply with the minimum funding requirements under ERISA;

    ii)  have the insurance protections which the participants had been promised would be provided by the PBGC in the event of the Plan terminated in an underfunded status; and

    iii)  be required to comply with many of the reporting and disclosure requirements under ERISA, including the requirement of providing notice to the participants of the Plan in the event SAMC and/or FSCSC failed to make adequate contributions to meet the minimum funding standards.

b)  That the Plan was amended and converted from an insured annuity plan to a plan funded through a trust, and that therefore the participants of the Plan would have to rely upon SAMC's and the Participating Employers' continued solvency and continued contributions to the Retirement Plan as well as the investment performance of the Trust in order to assure that the Plan would have sufficient assets to meet expected benefits payments.

c)   That the Plan was underfunded such that the assets of the Plan were not adequate to pay the full amount of the accrued benefits the participants were entitled to receive under the Plan upon reaching retirement age.

d)   That the participants would not receive the full amount of their accrued benefits under the Plan, which was either known, or should have been known to Defendants by at least June 30, 2004 due to the significant underfunding of the Plan.

e)   That, absent additional contributions by the SAMC, the Participating Employers, and/or FSCSC and/or a significantly improved performance of the Plan's investments, the Plan would not have sufficient assets to fully meet the benefit obligations promised to the participants.

## VI.   CLASS ALLEGATIONS

222.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated:

> All participants or beneficiaries of the Retirement Plan who suffered a reduction in accrued benefits under the Plan at the time the Retirement Plan was terminated.  Excluded from the Class are any high-level executives at SAMC and/or FSCSC or any employees who had responsibility for or involvement in the administration of the Plan or who are subsequently determined to be fiduciaries of the Retirement Plan, including the Individual Defendants.

### A.   Numerosity

223.   As of July 1, 2010, the Retirement Plan purportedly had a total of 1,923 participants, of which 378 were then active participants, 892 were participants with deferred benefits, and 653 were participants receiving benefits.  On information and

belief, as a result of the underfunding of the Retirement Plan, all of the participants of the Retirement Plan and their beneficiaries suffered uniform reductions in pension benefits under the Plan at the time the Retirement Plan was terminated.  As all of these participants and beneficiaries are members of the Class, the Class is so numerous that joinder of all members is impracticable.

**B.     Commonality**

224.    The issues regarding liability in this case present common questions of law and fact, with answers that are common to all members of the Class, including: (1) whether the Retirement Plan is exempt from ERISA as a Church Plan, and, if not; (2) whether the fiduciaries of the Retirement Plan have failed to administer and failed to enforce the funding obligations of the Plan in accordance with ERISA; (3) whether the fiduciaries of the Plan improperly terminated the Plan without complying with the requirements of ERISA such that the Plan continues to be an ERISA-covered plan; (4) whether as a consequence of the failure to properly terminate the Plan, SAMC and the Participating Employers, Communities and Holding Corporation, continue to be jointly and severally liable for payment of unfunded benefits due to the participants under the Plan and unpaid minimum funding contributions, 29 U.S.C. § 1362, 29 U.S.C. § 1364; and (5) whether FSCSC, as the sole corporate member of SAMC and Communities is part of a controlled group that is jointly and severally liable along with SAMC and Communities for any unfunded benefits under the Plan.

225.    The issues regarding the relief are also common to the members of the Class as the relief will consist of (1) a declaration that the Retirement Plan is an ERISA-covered plan; (2) a declaration that the Plan was not properly terminated under ERISA and therefore continues to be an ERISA-covered plan; (3) an order reforming the

Retirement Plan, and requiring that the Retirement Plan be funded, administered, and terminated in compliance with ERISA; (4) a declaration that SAMC, and the Participating Employers are obligated to comply with the terms of the Plan and provide each member of the Class the full amount of benefits provided under the Plan; (5) a declaration that FSCSC, as the sole corporate member of SAMC and Communities, is part of a controlled group that is jointly and severally liable along with SAMC and Communities for any unfunded benefits under the Plan; and (6) an order requiring FSCSC to pay civil penalties to the Class in the same statutory daily amount for each member of the Class.

## C.      Typicality

226.      Plaintiffs' claims are typical of the claims of the other members of the Class because their claims arise from the same event, practice and/or course of conduct, namely Defendants' failure to maintain and terminate the Plan in accordance with ERISA.  Plaintiffs' claims are also typical because all Class members are similarly affected by Defendants' wrongful conduct.

227.      Plaintiffs' claims are also typical of the claims of the other members of the Class because, to the extent Plaintiffs seeks equitable relief, it will affect all Class members equally.  Specifically, the equitable relief sought consists primarily of (i) a declaration that the Retirement Plan is not a Church Plan; (ii) a declaration that the Plan was not terminated in compliance with ERISA and therefore continues to be an ERISA covered plan; (iii) a declaration that the Retirement Plan is an ERISA-covered plan that must comply with the administration and funding requirements of ERISA; (iv) a declaration that SAMC and the Participating Employers are obligated to comply with the terms of the Plan and provide each member of the Class the full amount of benefits

provided under the Plan, unpaid minimum funding contributions, and termination premiums; and (v) a declaration that FSCSC, as the sole corporate member of SAMC and Communities, is part of a controlled group that is jointly and severally liable along with SAMC and Communities for any unfunded benefits under the Plan.  In addition, to the extent Plaintiffs seek monetary relief, it is for civil fines to the Class in the same statutory daily amount for each member of the Class.

228.    Neither SAMC nor FSCSC has any defenses unique to Plaintiffs' claims that would make Plaintiffs' claims atypical of the remainder of the Class.

**D.      Adequacy**

229.    Plaintiffs will fairly and adequately represent and protect the interests of all members of the Class.

230.    Plaintiffs do not have any interests antagonistic to or in conflict with the interests of the Class.

231.    Defendants SAMC, FSCSC and the Individual Defendants have no unique defenses against the Plaintiffs that would interfere with Plaintiffs' representation of the Class.

232.    Plaintiffs have engaged counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

**E.      Rule 23(b)(1) Requirements**

233.    The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

234.    The requirements of Rule 23(b)(1)(B) are satisfied because adjudications of these claims by individual members of the Class would, as a practical matter, be

dispositive of the interests of the other members not parties to the actions, or substantially impair or impede the ability of other members of the Class to protect their interests.

**F.    Rule 23(b)(2) Requirements**

235.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**G.    Rule 23(b)(3) Requirements**

236    Alternatively, if the Class is not certified under Rule 23(b)(1) or (b)(2) then certification under (b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members. The common issues of law or fact that predominate over any questions affecting only individual members include: (1) whether the Plan is exempt from ERISA as a Church Plan, and if not, (2) whether Defendants SAMC and FSCSC failed to cause the Plan to be terminated in compliance with ERISA such that the Plan continues to be an ERISA-covered plan, (3) whether SAMC and the Participating Employers are jointly and severally liable for the unfunded benefits due to plan participants and beneficiaries, unpaid minimum funding contributions, and termination premiums, (4) whether FSCSC, as the sole corporate member of SAMC and Communities, is part of a controlled group that is jointly and severally liable along with SAMC and Communities for any unfunded benefits under the Plan, (5) whether the fiduciaries of the Plan have failed to administer and enforce funding of the Plan in accordance with ERISA, and (6) whether the Church Plan exemption, as claimed by SAMC and FSCSC, violates the Establishment Clause of

the First Amendment. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

> A. Individual Class members do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action because the equitable relief sought by any Class member will either inure to the benefit of the Plan or affect each Class member equally;

> B. Individual Class members also do not have an interest in controlling the prosecution of these claims because the monetary relief that they could seek in any individual action is identical to the relief that is being sought on their behalf herein;

> C. There is no other litigation begun by any other Class member concerning the issues raised in this litigation;

> D. This litigation is properly concentrated in this forum, which is where Defendants SAMC and FSCSC are headquartered;

> E. There are no difficulties managing this case as a class action.

## VII.   CAUSES OF ACTION

### COUNT I

**(Claim for Equitable Relief Pursuant to ERISA § 502(a)(3))**
**Against Defendants SAMC and FSCSC**

237. Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs herein.

238. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to obtain "appropriate equitable relief . . . to enforce any provisions of [Title I of ERISA]."  Pursuant to this provision, 28 U.S.C. §§ 2201 and

2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief that the Retirement Plan is not a Church Plan within the meaning of ERISA § 3(33), 29 U.S.C. § 1002(33), and thus is subject to the provisions of Title I of ERISA. Counts I and XIV of the Amended Complaint are brought pursuant to these provisions.

239.    As the Retirement Plan is not a Church Plan within the meaning of ERISA § 3(33), 29 U.S.C. § 1002(33), and meets the definition of a pension plan under ERISA § 3(2), 29 U.S.C. § 1002(2), the Retirement Plan should be declared to be an ERISA-covered pension plan, and the Retirement Plan's sponsors, SAMC and FSCSC, should be ordered to bring the Plan into compliance with ERISA, including by remedying the violations set forth below.

## COUNT II

**(Claim for Failure to Terminate the Plan in Compliance With ERISA § 4041) Against Defendants SAMC and FSCSC**

240.    Plaintiffs incorporate and re-allege by reference to the foregoing paragraphs as if fully set forth herein.

241.    ERISA § 4070(a), 29 U.S.C. § 1370(a), authorizes a participant or beneficiary to bring a civil action to obtain "appropriate equitable relief" to enforce and redress violations of Title IV of ERISA, including violations of ERISA §§ 4041 and 4062, 29 U.S.C. §§ 1341 and 1362. Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief that: (i) SAMC and FSCSC did not properly terminate the Retirement Plan in compliance with ERISA § 4041(c), 29 U.S.C. § 1341(c), such that the Plan is still an existing Plan under ERISA; (ii) the Plan be terminated in compliance with ERISA; and (iii) to the extent the Plan is not fully funded upon termination, pursuant to ERISA § 4062(a) and (b), 29

U.S.C § 1362(a) and (b), SAMC and FSCSC, the Participating Employers and members of their controlled group are jointly and severally liable to all participants and beneficiaries for the total amount of the unfunded benefits due under the plan. Counts II and III of the Amended Complaint are brought pursuant to these provisions.

242.    ERISA § 4041(c), 29 U.S.C. § 1341(c), provides the exclusive means for a distress termination of an underfunded Retirement Plan and, among other things, requires that: (i) the Plan Administrator provide affected parties, including the participants and beneficiaries of the Plan, with at least 60 days advance notice of intent to terminate; (ii) the Plan Administrator file with the PBGC a distress termination notice no later than 120 days after the proposed termination date; and (iii) the PBGC determines that each contributing sponsor of the plan and each member of its controlled group satisfy one of the distress criteria under ERISA § 4041(c)(2)(B), 29 U.S.C. § 1341(c)(2)(B).

243.    In order to meet the requirements for a distress termination, each contributing sponsor and each member of its controlled group must satisfy at least one of the following criteria under ERISA § 4041(c)(2)(B), 29 U.S.C. § 1341(c)(2)(B): (i) liquidation, (ii) reorganization, (iii) inability to continue in business, or (iv) unreasonably burdensome pension costs. Neither SAMC, the other Participating Employers, Communities or Holding Corp., nor their controlled groups, FSCSC and Franciscan Alliance satisfied any of these criteria for distress termination.

244.    FSCSC and/or SAMC as Plan Administrator did not file notices of termination with the participants of the Plan and the PBGC which complied with 29 C.F.R. §§ 4041.43 and 4041.45 and the PBGC did not make the required determination that SAMC, Communities or Holding Corp., nor their controlled groups, FSCSC, and

Franciscan Alliance satisfied one of the distress criteria under 29 C.F.R. §

4041.41(c)(2)(B), in that they were not: (i) in a liquidation proceeding under federal

bankruptcy law; (ii) in a reorganization proceeding under federal bankruptcy law; (iii)

unable to pay their debts when due; and (iv) the cost of providing pension coverage had

not become unreasonably burdensome due solely to the decline in the workforce covered

by the controlled group members' pension plans.

245.     SAMC and FSCSC did not comply with the requirements of ERISA §

4041(c) when they declared on April 10, 2012, that the Retirement Plan was terminated

effective March 31, 2012, and therefore their actions did not have the effect of

terminating the Plan such that the Plan is still an existing Plan under ERISA today that is

underfunded by at least $32 million relating to benefits which accrued prior to the

attempted freezing.

## COUNT III

**(Claim that SAMC, the Participating Employers and Their Controlled Group
Members Are Jointly and Severally Liable for Payment of Unfunded Benefits Due
Under the Plan)
Against FSCSC, SAMC, the Participating Employers (Communities and Holding
Corp.), and Franciscan Alliance**

246.     Plaintiffs incorporate and re-allege by reference to the foregoing

paragraphs as if fully set forth herein.

247.     ERISA § 4070(a), 29 U.S.C. § 1370(a), authorizes a participant or

beneficiary to bring a civil action to obtain "appropriate equitable relief" to enforce and

redress violations of Title IV of ERISA, including violations of ERISA §§ 4062, 29

U.S.C. §§ 1341 and 1362.  Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and

Federal Rule of Civil Procedure 57, (i)  Plaintiffs seek declaratory and injunctive relief

that: SAMC & FSCSC must terminate the Retirement Plan,which is still in existence

(because it was not properly terminated, see Count II above),; (ii) Plaintiffs seek a declaration that SAMC and the Participating Employers as contributing sponsors, and their controlled group members (FSCSC and Franciscan Alliance), are jointly and severally liable to all participants and beneficiaries for the total amount of the unfunded benefits due under the plan and equitable relief in the form of payment to the plan of all unfunded benefits due under the Plan; and (iii) in the alternative, should the Plan be found terminated as of March 31, 2012, because the Plan was not fully funded at such date, Plaintiffs seek declarative relief that SAMC and the Participating Employers, as contributing sponsors, and their controlled group members (FSCSC and Franciscan Alliance), are jointly and severally liable to all participants and beneficiaries for the total amount of the unfunded benefits due under the plan at the time of termination, March 31, 2012, plus interest, pursuant to ERISA § 4062(a) and (b), 29 U.S.C § 1362(a) and (b) and equitable relief in the form of a monetary payment to the class from SAMC and the Participating Employers as contributing sponsors, and their controlled group members (FSCSC and Franciscan Alliance) of the total amount of the unfunded benefits due under the plan at the time of termination, March 31, 2012, plus interest pursuant to ERISA § 4062(a) and (b), 29 U.S.C § 1362(a) and (b).

248.    Pursuant to ERISA §§ 4062(a) and (b), 29 U.S.C §§ 1362(a) and (b), SAMC,  Communities, and Holding Corporation, each of which is an employer responsible for making contributions under the Plan as described in ERISA § 302(b)(1), 29 U.S.C. § 1082(b)(1), and thus each a "contributing sponsor" within the meaning of ERISA § 4001(a)(13), 29 U.S.C. § 1301(a)(13) are jointly and severally liable to all

participants and beneficiaries for the total amount of the unfunded benefits due under the plan, including interest as of the Plan's termination date.

249. In addition, under ERISA § 4062(a) and (b), 29 U.S.C § 1362(a) and (b), all controlled group members of each of the contributing sponsors are jointly and severally liable to all participants and beneficiaries for the total amount of the unfunded benefits due under the plan, including interest as of the Plan's termination date. Pursuant to 29 C.F.R. § 4001.2, "[a]ny reference to a plan's controlled group means all contributing sponsors of the plan and all members of each contributing sponsor's controlled group."

250. FSCSC was/is a member of SAMC's controlled group under § 4001(a)(14), 29 U.S.C. § 1301(a)(14), and implementing regulations at 26 C.F.R. § 1.414(c)-2(b) because FSCSC owned 100% of SAMC at the time the Plan was purportedly terminated as set forth in paragraphs 51-54 above.

251. FSCSC is a member of Communities' controlled group under § 4001(a)(14), 29 U.S.C. § 1301(a)(14), and implementing regulations at 26 C.F.R. § 1.414(c)-2(b) because FSCSC owned 100% of Communities at the time the Plan was purportedly terminated as set forth in paragraphs 51-54 above.

252. Franciscan Alliance is a member of Holding Corp.'s controlled group under § 4001(a)(14), 29 U.S.C. § 1301(a)(14), and implementing regulations at 26 C.F.R. § 1.414(c)-2(b) because Franciscan Alliance owned a 100% interest in Holding Corp. at the time the Plan was purportedly terminated.

253. Because the Retirement Plan was not properly terminated in compliance with ERISA and is still an existing Plan (see Count II above), SAMC and FSCSC are

obligated to terminate the Plan in compliance with ERISA as provided in ERISA §

4041(c), 29 U.S.C. § 1341(c).

254. Upon such termination, because the Plan is not fully funded, SAMC and

the Participating Employers as contributing sponsors, and the controlled group

members (FSCSC and Franciscan Alliance), are jointly and severally liable to all

participants and beneficiaries for the total amount of the unfunded benefits due under

the plan pursuant to ERISA § 4062(a) and (b), 29 U.S.C § 1362(a) and (b).

255. In the alternative, should the Plan be found terminated as of March 31,

2012, because the Plan was not fully funded at such date, SAMC and the Participating

Employers as contributing sponsors, and the controlled group members (FSCSC and

Franciscan Alliance), are jointly and severally liable to all participants and beneficiaries

for the total amount of the unfunded benefits due under the plan at the time of

termination, March 31, 2012, plus interest, pursuant to ERISA § 4062(a) and (b), 29

U.S.C § 1362(a) and (b).

### COUNT IV

**(Claim for Violation of Reporting and Disclosure Provisions)**
**Against Defendants SAMC and FSCSC, the Retirement Committee and/or the**
**Members of the Retirement Committee**

256. Plaintiffs incorporate and re-allege by reference to the foregoing

paragraphs as if fully set forth herein.

257. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), also authorizes a participant

or beneficiary to bring a civil action "(A) to enjoin any act or practice which violates any

provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate

equitable relief (i) to redress such violations or (ii) to enforce any provisions of this

subchapter or the terms of the plan." Pursuant to these provisions, Plaintiffs seek orders

directing SAMC and FSCSC, as the sponsors and/or administrators of the Retirement Plan, to reform the Retirement Plan and bring it into compliance with ERISA. Counts IV through VII and Count X of the Amended Complaint are brought pursuant to these provisions.

**Summary Plan Descriptions**

258.   At no time have SAMC and FSCSC and/or the members of the Retirement Committee provided Plaintiffs or any member of the Class with a Summary Plan Description with respect to the Retirement Plan that meets the requirements of ERISA § 102, 29 U.S.C. § 1022, and the regulations promulgated thereunder.

259.   Because SAMC and FSCSC and/or the members of the Retirement Committee have been the Plan Administrators at all relevant times, SAMC and FSCSC and/or the members of the Retirement Committee have violated ERISA § 104, 29 U.S.C. § 1024, by failing to provide Plaintiffs and members of the Class with adequate Summary Plan Descriptions.

**Annual Reports**

260.   During the relevant time period, Defendants SAMC and/or FSCSC have not filed annual reports with respect to the Retirement Plan with the Secretary of Labor in compliance with ERISA § 103, 29 U.S.C. § 1023. Nor has a Form 5500 and associated schedules and attachments with respect to the Retirement Plan been filed, which the Secretary has approved as an alternative method of compliance with ERISA § 103, 29 U.S.C. § 1023.

261.   Because SAMC and FSCSC and/or the members of the Retirement Committee have been the Plan Administrators of the Retirement Plan at all relevant times, SAMC and FSCSC and/or the members of the Retirement Committee have

violated ERISA § 104(a), 29 U.S.C. § 1024(a), by failing to file annual reports with respect to the Retirement Plan with the Secretary of Labor in compliance with ERISA § 103, 29 U.S.C. § 1023, or Form 5500s and associated schedules and attachments, which the Secretary has approved as an alternative method of compliance with ERISA § 103, 29 U.S.C. § 1023.

**Summary Annual Reports**

262.    At no time during the relevant time period have SAMC and/or FSCSC and/or the members of the Retirement Committee furnished Plaintiffs or any member of the Class with a Summary Annual Report with respect to the Retirement Plan in compliance with ERISA § 104(b)(3) and the regulations promulgated thereunder.  29 U.S.C. § 1024(b)(3).

263.    Because SAMC and/or FSCSC and/or the members of the Retirement Committee have been the Plan Administrators of the Retirement Plan at all relevant times, SAMC and/or FSCSC and/or the members of the Retirement Committee have violated ERISA § 104(b)(3), 29 U.S.C. § 1024(b)(3), by failing to furnish Plaintiffs or any member of the Class with a Summary Annual Report with respect to the Retirement Plan in compliance with ERISA § 104(b)(3) and the regulations promulgated thereunder. 29 U.S.C. § 1024(b)(3).

**Notification of Failure to Meet Minimum Funding**

264.    At no time during the relevant time period has SAMC and/or FSCSC furnished Plaintiffs or any member of the Class with a Notice with respect to the Retirement Plan pursuant to ERISA § 101(d)(1), 29 U.S.C. § 1021(d)(1), informing them that SAMC and/or FSCSC had failed to make the payments required to comply with ERISA § 302, 29 U.S.C. § 1082, with respect to the Retirement Plan.

265. Defendants SAMC and/or FSCSC have been the employers that established and maintained the Retirement Plan.

266. During the relevant time period, Defendants SAMC, the Participating Employers, and/or FSCSC failed to fund the Retirement Plan in accordance with ERISA § 302, 29 U.S.C. § 1082.

267. As the employers maintaining the Retirement Plan, Defendants SAMC and/or FSCSC have violated ERISA § 302, 29 U.S.C. § 1082, by failing to fund the Retirement Plan, are liable for their own violations of ERISA § 101(d)(1), 29 U.S.C. § 1021(d)(1), and as such may be required by the Court to pay Plaintiffs and each Class member up to $110 per day (as permitted by 29 C.F.R. § 2575.502(c)(3)) for each day that Defendants have failed to provide Plaintiffs and each Class member with the notice required by ERISA § 101(d)(1), 29 U.S.C. § 1021(d)(1).

**Funding Notices**

268. At no time during the relevant time period have SAMC and/or FSCSC and/or the members of the Retirement Committee furnished Plaintiffs or any member of the Class with a Funding Notice with respect to the Retirement Plan in accordance with ERISA § 101(f), 29 U.S.C. § 1021(f).

269. At all relevant times, SAMC and/or FSCSC and/or the members of the Retirement Committee have been the administrators of the Retirement Plan.

270. As the administrators of the Retirement Plan, SAMC and/or FSCSC and/or the members of the Retirement Committee have violated ERISA § 101(f) by failing to provide each participant and beneficiary of the Retirement Plan with the Funding Notice required by ERISA § 101(f), and as such may be required by the Court to pay Plaintiffs and each Class member up to $110 per day (as permitted by 29 C.F.R. §

2575.502(c)(3)) for each day that Defendants have failed to provide Plaintiffs and each Class member with the notice required by ERISA § 101(f).  29 U.S.C. § 1021(f).

**Pension Benefit Statements**

271.    At no time during the relevant time period have SAMC and/or FSCSC and/or the members of the  Retirement Committee furnished Plaintiffs or any member of the Class with a Pension Benefit Statement with respect to the Retirement Plan in accordance with ERISA § 105(a)(1), 29 U.S.C. § 1025(a)(1).

272.    At all relevant times, SAMC and/or FSCSC and/or the members of the Retirement Committee have been the administrators of the Retirement Plan.

273.    As the administrators of the Retirement Plan, SAMC and FSCSC and/or the members of the Retirement Committee have violated ERISA § 105(a)(1) and as such may be required by the Court to pay Plaintiffs and each Class member up to $110 per day (as permitted by 29 C.F.R. § 2575.502(c)(3)) for each day that Defendants have failed to provide Plaintiffs and each Class member with the Pension Benefit Statements required by ERISA § 105(a)(1).  29 U.S.C. § 1025(a)(1).

**COUNT V**

**(Claim for Failure to Provide Minimum Funding)**
**Against Defendants SAMC, FSCSC, the Participating Employers, and Franciscan Alliance**

274.    Plaintiffs incorporate and re-allege by reference to the foregoing paragraphs as if fully set forth herein.

275.    ERISA § 302, 29 U.S.C. § 1082, establishes minimum funding standards for defined benefit plans that require employers to make minimum contributions to their

plans so that each plan will have assets available to fund plan benefits if the employer maintaining the plan is unable to pay benefits out of its general assets.

276.    ERISA § 302(b)(2), 29 U.S.C. § 1082(b)(2) provides if an employer that is responsible for making contributions under the Plan is a member of a controlled group, "each member of such group shall be jointly and severally liable for payment of such contributions." As 29 C.F.R. § 4001.2 makes clear, "[a]ny reference to a plan's controlled group means all contributing sponsors of the plan and all members of each contributing sponsor's controlled group."

277.    The Plan and 2005 SPD identifies SAMC, Communities, and Holding Corp. as Participating Employers who were responsible for making funding contributions to the Plan.

278.    As set forth in Count III above, FSCSC is a member of the SAMC and Communities controlled group because FSCSC owned 100% of SAMC and 100% of Communities during the entire period when minimum contributions to the Plan were required.

279.    As set forth in Count III above, Franciscan Alliance is a member of the Holding Corp. controlled group because Franciscan Alliance owned 100% of Holding Corp. during the entire period when minimum contributions to the Plan were required.

280.    As such, SAMC, the other Participating Employers (Communities and Holding Corporation), FSCSC, and Franciscan Alliance were all jointly and severally liable for the contributions to the Plan due under ERISA § 302, 29 U.S.C. § 1082.

281.    SAMC, the other Participating Employers, FSCSC and/or Franciscan

Alliance have failed to make contributions sufficient to meet the minimum funding

standards of ERISA § 302, 29 U.S.C. § 1082.

282.    By failing to make the required contributions to the Retirement Plan,

either in whole or in partial satisfaction of the minimum funding requirements established

by ERISA § 302, Defendants SAMC, the Participating Employers, FSCSC and/or

Franciscan Alliance have violated ERISA § 302, 29 U.S.C. § 1082.

283.    Accordingly Defendants SAMC, the Participating Employers, FSCSC

and/or Franciscan Alliance are all jointly and severally liable to make all contributions

due to the Plan (which has not been terminated as set forth in Count II) under ERISA §

302, 29 U.S.C. § 1082.

284.    Alternatively, Defendants SAMC, the Participating Employers, FSCSC

and/or Franciscan Alliance were all jointly and severally liable to make all contributions

due to the Plan under ERISA § 302, 29 U.S.C. § 1082 prior to the 2012 termination and

are still jointly and severally liable to the Plaintiffs and the Class for those unpaid

contributions plus interest under ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3).

## COUNT VI

**(Claim for Failure to Establish the Plan Pursuant to a Written Instrument
Meeting the Requirements of ERISA § 402)
Against Defendants SAMC and/or FSCSC**

285.    Plaintiffs incorporate and re-allege by reference to the foregoing

paragraphs as if fully set forth herein.

286.    ERISA § 402, 29 U.S.C. § 1102, provides that every plan will be

established pursuant to a written instrument which will provide, among other things, "for

one or more named fiduciaries who jointly or severally shall have authority to control and

manage the operation and administration of the plan" and will "provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of [Title I of ERISA]."

287.     Although the benefits provided by the Retirement Plan were described to the employees and retirees of SAMC and the Participating Employers in various written communications, the Retirement Plan has never been established pursuant to a written instrument meeting the requirements of ERISA § 402, 29 U.S.C. § 1102.

288.     Among other things, the plan as written violates ERISA because the plan document does not provide an adequate funding policy in compliance with ERISA § 402(b)(1), 29 U.S.C. § 1102(b)(1) in that it does not require funding of accrued benefits at termination, but only requires the distribution of the assets of the plan available to provide benefits to be allocated among participants at termination.

289.     As Defendants SAMC and/or FSCSC have been responsible for maintaining the Retirement Plan and SAMC and/or FSCSC has amendment power over the Retirement Plan, Defendants SAMC and/or FSCSC violated Section 402 by failing to promulgate written instruments in compliance with ERISA § 402 to govern the Retirement Plan's operations and administration.  29 U.S.C. § 1102.

## COUNT VII

**(Claim for Failure to Establish a Trust Meeting the Requirements of ERISA § 403)
Against Defendants SAMC and/or FSCSC**

290.     Plaintiffs incorporate and re-allege by reference to the foregoing paragraphs as if fully set forth herein.

291.     ERISA § 403, 29 U.S.C. § 1103, provides, subject to certain exceptions not applicable here, that all assets of an employee benefit plan shall be held in trust by

one or more trustees, that the trustees shall be either named in the trust instrument or in the plan instrument described in section 402(a), 29 U.S.C. § 1102(a), or appointed by a person who is a named fiduciary.

292.     Although the Retirement Plan's assets have been held in trust, the trust does not meet the requirements of ERISA § 403, 29 U.S.C. § 1103.

293.     As Defendants SAMC and/or FSCSC have been responsible for maintaining the Retirement Plan and have amendment power over the Retirement Plan, Defendants SAMC and/or FSCSC violated section 403 by failing to put the Retirement Plan's assets in trust in compliance with ERISA § 403.  29 U.S.C. § 1103.

## COUNT VIII

**(Claim for Civil Money Penalty Pursuant to ERISA § 502(a)(1)(A))
Against Defendants SAMC and/or FSCSC, the Retirement Committee
and/or the Members of the Retirement Committee**

294.     Plaintiffs incorporate and re-allege by reference to the foregoing paragraphs as if fully set forth herein.

295.     ERISA § 502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A), provides that a participant may bring a civil action for the relief provided in ERISA § 502(c), 29 U.S.C. § 1132(c). Count VIII of the Amended Complaint is brought pursuant to this provision.

296.     ERISA § 502(c)(3), 29 U.S.C. § 1132(c)(3), as amended per 29 C.F.R. § 2575.502(c)-(3), provides that an employer maintaining a plan who fails to meet the notice requirement (relating to a plan's failure to meet the minimum funding standard) of ERISA § 101(d), 29 U.S.C. § 1021(d), with respect to any participant and beneficiary may be liable for up to $110 per day from the date of such failure.

297.     ERISA § 502(c)(3), 29 U.S.C. § 1132(c)(3), as amended per 29 C.F.R. § 2575.502(c)-(3), provides that an administrator of a defined benefit pension plan who

fails to meet the notice requirement (relating to defined benefit plan funding notices) of ERISA § 101(f), 29 U.S.C. § 1021(f), with respect to any participant and beneficiary may be liable for up to $110 per day from the date of such failure.

298.    ERISA § 502(c)(3), 29 U.S.C. § 1132(c)(3), as amended per 29 C.F.R. § 2575.502(c)-(3), provides that an administrator of a defined benefit pension plan who fails to provide a Pension Benefit Statement at least once every three years to a participant with a nonforfeitable accrued benefit who is employed by the employer maintaining the plan at the time the statement is to be furnished as required by ERISA § 105(a), 29 U.S.C. § 1025(a), may be liable for up to $110 per day from the date of such failure.

299.    As Defendants SAMC and/or FSCSC are the employers maintaining the Retirement Plan and have failed to give the notices required by ERISA § 101(d), 29 U.S.C. § 1021(d), as set forth in Count IV, Defendants SAMC and/or FSCSC are liable to the Plaintiffs and each member of the Class in an amount up to $110 per day from the date of such failures until such time that notices are given and the statements are provided, as the Court, in its discretion, may order.

300.    As Defendants SAMC, FSCSC, the Retirement Committee and/or the members of the Retirement Committee are the Administrators of the Retirement Plan and have failed to give the notice required by ERISA § 101(f), 29 U.S.C. § 1021(f), and the Pension Benefit Statement required by ERISA § 105(a), 29 U.S.C. § 1025(a), as set forth in Count IV, Defendants SAMC, FSCSC, the Retirement Committee and/or the members of the Retirement Committee are liable to the Plaintiffs and each member of the Class in an amount up to $110 per day from the date of such failures until such time

that notices are given and the statement is provided, as the Court, in its discretion, may order.

## COUNT IX

### (Claim for Benefits Pursuant to ERISA § 502(a)(1)(B))
### Against All Defendants

301.    Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs as if fully set forth herein.

302.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Count IX of the Amended Complaint is brought pursuant to this provision.

303.    The participants of the Retirement Plan who were vested at the time the Retirement Plan was converted from an Insured Annuity Plan to a Trusteed Plan or who became vested on the basis of service performed thereafter were eligible to receive an insured annuity at normal retirement age calculated and credited based upon their years of service and in the manner provided under the Plan.

304.    Nearly seventeen years later, in connection with the attempt by FSCSC and SAMC to terminate the Plan, the Plan was amended so as to reduce by forty percent the insured annuities that all participants of the Retirement Plan were entitled to receive.

305.    As a result of the amendment and attempted termination of the Plan, the Plaintiffs and the Class have been denied their rights to receive the full amount of insured annuities provided by the Retirement Plan, calculated and credited based upon their years

of service and in the manner pursuant to the Plan in effect at the time the Retirement Plan converted from an Insured Annuity Plan to a Trusteed Plan.

306. The retirement benefits which Plaintiffs and other Class members have received following the attempted termination of the Retirement Plan were calculated and distributed in a manner that was inconsistent with the provisions of the Plan in effect at the time the Retirement Plan was converted from an Insured Annuity Plan to a Trusteed Plan. As a result, Plaintiffs and the Class have received substantially less in retirement benefits than they would have received under the terms of the Plan in effect at the time the Retirement Plan was converted from an Insured Annuity Plan to a Trusteed Plan.

307. Plaintiffs and the Class are entitled, at a minimum, to receive retirement benefits equivalent to what they would have received under the Plan in effect at the time the Retirement Plan was converted from an Insured Annuity Plan to a Trusteed Plan.

## COUNT X

**(Claim for Violation of the Anti-Cutback Provision of ERISA § 204(g))
Against Defendants SAMC, FSCSC, the Retirement Committee
and/or the Members of the Retirement Committee**

308. Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs as if fully set forth herein.

309. ERISA § 204(g), 29 U.S.C. § 1054(g), provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan."

310. Under 26 C.F.R. § 1.411(d)-3(a)(1), "a plan amendment includes any changes to the terms of a plan . . . ."

311. ERISA § 3(23), 29 U.S.C. § 1002(23), defines "accrued benefit" in the case of a defined benefit plan as "the individual's accrued benefit determined under the

plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age."

312.    An accrued benefit is considered "decreased" for purposes of ERISA § 204(g) not only when it is eliminated entirely but also if it is reduced in size or if the plan imposes new conditions or materially greater restrictions on their receipt.

313.    Each of the Plaintiffs was entitled, when they reached retirement age, to receive an insured annuity calculated and credited based upon their years of service in the manner provided by the Plan in effect at the time the Retirement Plan converted from an Insured Annuity Plan to a Trusteed Plan.

314.    The Fifth Plan Amendment, which purported to terminate the Retirement Plan and resulted in up to a forty (40) percent reduction of the insured annuities that the Plaintiffs and members of the Class were eligible to receive under the terms of the Retirement Plan, constituted a prohibited cutback of benefits in violation of ERISA § 204(g), 29 U.S.C. § 1054(g).

315.    As a result, Plaintiffs and members of the Class are entitled to a recalculation of the benefits for which they are eligible in conformity with the provisions of the Retirement Plan as well as the payment of any additional benefits, including interest, which may be owed.

COUNT XI

(Claim for Breach of Fiduciary Duty)<br>
Against Defendants SAMC, FSCSC, the Retirement Committee and the Individual Defendants.

316.    Plaintiffs incorporate and re-allege by reference to the foregoing paragraphs as if fully set forth herein.

317.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides that a participant may bring a civil action "for appropriate relief under section 1109 [ERISA § 409, 29 U.S.C. § 1109] of this title" including recovery of any losses to the Retirement Plan from a fiduciary breach by a fiduciary of the Plan, the recovery of any profits resulting from such breach, and such other equitable or remedial relief as the Court may deem appropriate.  Counts XI through XIII of the Amended Complaint are brought pursuant to these provisions.

**Breach of the Duty of Prudence and Loyalty**

318.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides in pertinent part that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(a)     for the exclusive purpose of:

   (i)     providing benefits to participants and their beneficiaries; and

   (ii)     defraying reasonable expenses of administering the plan;

(b)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . [and]

319.     (c)     in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this [Title I of ERISA] and Title IV. As fiduciaries with respect to the Retirement Plan, Defendants had the authority to enforce each provision of ERISA alleged to have been violated in the foregoing paragraphs pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) and ERISA § 4070(a), 29 U.S.C. § 1370(a).  Having the authority to enforce the provisions of ERISA at those respective times, ERISA § 404(a)(1)(A)-(D), 29

U.S.C. § 1104(a)(1)(A)-(D), imposed on Defendants the respective duty to enforce those provisions in the interest of the participants and beneficiaries of the Retirement Plan during the times that each was a fiduciary of the Retirement Plan.

320. Defendants have never enforced any of the provisions of ERISA set forth in Counts I-VII with respect to the Retirement Plan.

321. By failing to enforce the provisions of ERISA set forth in Counts I-VII, including the requirement that the Plan be properly terminated as required under ERISA § 4041, 29 U.S.C. § 1341 Defendants breached the fiduciary duties that they owed to the Plaintiffs and the Class.

322. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) imposes upon Defendants the obligation to discharge their duties "in accordance with the documents and instruments governing the plan . . . ."

323. Among other things, the Retirement Plan provides that no amendment to the Plan is effective to the extent that it has the effect of decreasing a participant's accrued benefit.

324. Defendants breached their fiduciary obligations to discharge their duties in accordance with the Plan document by taking actions pursuant to the Fifth Amendment to implement the termination of the Retirement Plan, because such amendment decreased participants' accrued benefit and therefore should not have been given any effect by the Defendants.

325. ERISA § 404(a)(1)(A)-(D), 29 U.S.C. § 1104(a)(1)(A)-(D), also imposed on Defendants the further duty to take appropriate steps to purchase insured annuities to fund the benefits accrued by the Plaintiffs and the members of the Class as of the date of

the conversion of the Plan from an Insured Annuity Plan to a Trusteed Plan, or, in the alternative, to establish and maintain an adequate funding policy to assure that the contributions of the Participating Employers and investment performance of the Plan were adequate to satisfy the expected benefit payments of the Plan and to thereby meet the funding obligations of the Plan.

326.     Defendants breached these fiduciary obligations by failing to purchase insured annuities to fund the accrued benefits of the Plaintiffs and the members of the Class as of the date of the conversion of the Plan from an Insured Annuity Plan to a Trusteed Plan and by thereafter failing to assure that an adequate funding policy was established and maintained such that the contributions of the Participating Employers and investment performance of the Plan were adequate to pay the accrued benefits of the Plaintiffs and the members of the Class and meet the funding obligations of the Plan.

327.     The failure of Defendants to enforce the funding obligations owed to the Plan has resulted in a loss to the Retirement Plan equal to the foregone funding and earnings thereon and profited Defendants SAMC and/or FSCSC by providing them the use of money owed to the Retirement Plan for its general business purposes.

**Prohibited Transactions**

328.     ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits a fiduciary with respect to a plan from directly or indirectly causing a plan to extend credit to a party in interest, as defined in ERISA § 3(14), 29 U.S.C. § 1002(14), if he or she knows or should know that such a transaction constitutes an extension of credit to a party in interest.

329.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits a fiduciary with respect to a plan from directly or indirectly causing a plan to use assets for the

benefit of a party in interest if he or she knows or should know that such a transaction constitutes a use of plan assets for the benefit of a party in interest.

330.     ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits the use of plan assets by a fiduciary with respect to a plan in his or her own interest or for his or her own account.

331.     As fiduciaries with respect to the Plan and, with respect to SAMC and/or FSCSC, as an employer of employees covered by the Plan, and, with respect to Defendant Gosciej, an Officer of FSCSC, the Defendants at all relevant times were parties in interest with respect to the Retirement Plan pursuant to ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

332.     By failing to enforce the funding obligations created by ERISA and owed to the Plan, Defendants extended credit from the Retirement Plan to SAMC and/or FSCSC in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), when Defendants knew or should have known that their failure to enforce the funding obligation constituted such an extension of credit.

333.     By failing to enforce the funding obligations created by ERISA and owed to the Retirement Plan, Defendants used Retirement Plan assets for SAMC's and/or FSCSC's own benefit, when Defendants knew or should have known that their failure to enforce the funding obligations constituted such a use of Retirement Plan assets in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

334.     By failing to enforce the funding obligations created by ERISA and owed to the Retirement Plan, Defendants used Retirement Plan assets in SAMC's and/or FSCSC's interest in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

335. The failure of Defendants to enforce the funding obligations owed to the Retirement Plan has resulted in a loss to the Retirement Plan equal to the foregone funding and earnings thereon.

336. The failure of Defendants to enforce the funding obligations owed to the Retirement Plan has profited Defendants SAMC and/or FSCSC by providing them the use of money owed to the Retirement Plan for its general business purposes.

## COUNT XII

**(Claim for Breach of Fiduciary Duty to Monitor)**
**Against FSCSC, SAMC and the FSCSC Board of Director Defendants**

337. Plaintiffs re-allege and incorporate by reference to each of the foregoing paragraphs as if fully set forth herein.

338. During the Class Period, SAMC and FSCSC were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence set forth in ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), including the duty to monitor the performance of other fiduciaries which they had the responsibility to appoint and remove.

339. In the case of FSCSC, this included the duty to monitor SAMC, whose Board FSCSC had the responsibility to appoint and remove. And, in the case of SAMC, this included the duty to monitor the fiduciaries of the Retirement Plan, for whom it had responsibility to appoint and remove, including the members of the Retirement Committee, the Trustee, and any investment manager.

340. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the

investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

341.     The monitoring duty further requires that appointing fiduciaries have procedures in place so that they may review and evaluate, on an ongoing basis, whether the "hands-on" fiduciaries and the appointing fiduciaries whom they appoint are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a viable process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to Plan participants or for deciding whether to retain or remove them.

342.     Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with the complete and accurate information in his or her possession that he or she knows or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan, including decisions regarding plan investments and adequate funding of the plan.

343.     Defendants SAMC and FSCSC breached their fiduciary monitoring duties by, among other things: (a) permitting their appointees to convert the Retirement Plan from an Insured Annuity Plan to a Trusteed Plan without taking appropriate steps to purchase insured annuities to fund the benefits accrued by the Plaintiffs and the members of the Class as of the date of the conversion; (b) failing, at least with respect to the future funding of the Trusteed Plan, to monitor their appointees, to evaluate their performances, or to have any system in place for ensuring that an adequate funding policy was

established for the Retirement Plan; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Retirement Plan's assets and level of funding; and (d) failing to remove appointees who did not purchase insured annuities at the time of the conversion and did not establish adequate funding policies and methods after the conversion to insure that the accrued benefits of the Plaintiffs and the members of the Class would be paid.

344.    As a consequence of the breaches of fiduciary duty of SAMC and FSCSC: (1) annuities were not purchased to insure the benefits which the Plaintiffs and members of the Class had accrued at the time of the conversion to a Trusteed Plan, and (2) the Retirement Plan, after the conversion to Trusteed Plan, became grossly underfunded such that when the Retirement Plan was terminated it had insufficient assets to make the Plan's promised benefit payments.

345.    If SAMC and FSCSC had discharged their fiduciary monitoring duties as described above, either insured annuities would have been purchased to provide the accrued benefits at the time of the conversion and/or after the conversion adequate contributions would have been made to fund sufficiently the Plan to pay accrued benefits at the time of termination.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Retirement Plan did not have the assets necessary to pay promised benefits and the benefits earned by the Plaintiffs and Class members were reduced substantially.

# COUNT XIII

### (Claim For Co-Fiduciary Liability)
### Against SAMC, FSCSC, and the Individual Defendants

346.    Plaintiffs re-allege and incorporate by reference to each of the foregoing paragraphs as if fully set forth herein.

347.    This Count alleges ERISA co-fiduciary liability against SAMC, FSCSC, and the Individual Defendants (the "Co-Fiduciary Defendants").

348.    During the Class Period, SAMC, FSCSC, and the Individual Defendants were fiduciaries of the Retirement Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and thus were bound by the duties of loyalty, exclusive purpose, and prudence.

349.    ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability that they may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if they know of a breach and fail to remedy it, knowingly participate in a breach, or enable a breach.  The Co-Fiduciary Defendants breached all three provisions.

350.    **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he or she has knowledge of a breach by such other fiduciary, unless he or she makes reasonable efforts under the circumstances to remedy the breach. As detailed herein, each Co-Fiduciary Defendant knew of certain breaches by the other fiduciaries and made no efforts to remedy those breaches.

351.    The members of the Retirement Committee and FSCSC were aware that, despite the fact that the Retirement Plan had been converted from an Insured Annuity

Plan to a Trusteed Plan, SAMC had failed to purchase insured annuities to secure the benefits of the Plaintiffs and the members of the Class which had accrued as of the date of the conversion.

352. The members of the Retirement Committee and FSCSC were aware that, despite the fact that the Retirement Plan had a continuing obligation to pay benefits to the participants of the Retirement Plan, SAMC failed to establish an adequate funding policy and method and to take appropriate steps to assure that the Participating Employers sufficiently funded the Plan after it became a Trusteed Plan to meet the expected benefit payments under the Retirement Plan on both a short-term and a long-term basis.

353. FSCSC, SAMC, and the members of the Retirement Committee were all aware of the respective failures of each in failing to comply with the provisions of ERISA as alleged in Counts IV though VII, IX, X and XI.

354. FSCSC and SAMC were both aware of the failures of each to monitor the activities of their appointed fiduciaries, including the failure to monitor the Retirement Committee and its compliance with ERISA.

355. Because Defendants knew of the breaches of the other Defendants detailed above yet failed to undertake any effort to remedy these breaches, they are each liable for those breaches.

356. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if they participate knowingly in, or knowingly undertake to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.

357.     FSCSC knowingly participated in the fiduciary breaches of SAMC, the Retirement Committee and the members of the Retirement Committee in that it exercised control over their conduct and directly benefited from such control when it was able to maximize the amount of money it was able to upstream to itself from proceeds of the sale of St. Anthony, the only asset of SAMC, by (a) not causing SAMC to make adequate contributions to the Retirement Plan to purchase insured annuities to secure the benefits of the Plaintiffs and the members of the Class which had accrued as of the date of the conversion from an Insured Annuity Plan to a Trusteed Plan, and (b) failing to assure that an adequate funding policy and method was adopted by SAMC and that appropriate steps were taken to assure that the Participating Employers sufficiently funded the Plan after the conversion to meet the expected benefit payments under the Retirement Plan.

358.     **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29  U.S.C. § 1104(a)(1), in the administration of the specific responsibilities which give rise to their status as a fiduciary, they have enabled another fiduciary to commit a breach.

359.     FSCSC and SAMC, by committing the breaches that resulted from their failure to monitor the fiduciaries they appointed and controlled, as described above, enabled breaches by SAMC and the members of the Retirement Committee.

360.     As a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, insufficient contributions were made to the Retirement Plan by the Participating Employers, resulting in the Retirement Plan becoming grossly underfunded such that when the Retirement Plan was terminated, the Plaintiffs and other members of the Class lost millions of dollars in vested retirement benefits.

361.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109,

1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the

Plan, which are the result of their breaches of fiduciary duties alleged in this Count, and

to provide other equitable relief as appropriate.

## COUNT XIV

**(Claim for Declaratory Relief that the Church Plan Exemption, as Claimed
by SAMC and/or FSCSC, Violates the Establishment Clause of the First
Amendment of the Constitution and is Therefore Void and Ineffective)**

362.     Plaintiffs incorporate and re-allege by reference to the foregoing

paragraphs as if fully set forth herein.

363.     The ERISA Church Plan exemption is an accommodation that exempts

churches and associations of churches, under certain circumstances, from compliance

with ERISA.

364.     The ERISA Church Plan exemption, as claimed by SAMC and/or FSCSC,

is an attempt to extend the accommodation beyond churches and associations of churches

to SAMC and/or FSCSC—non-profit corporations operating a network of senior living

communities that chose to compete with commercial businesses, including other non-

profits as well as for-profits.  Extension of the Church Plan exemption to SAMC and

FSCSC under these circumstances violates the Establishment Clause because it (A) is not

necessary to further the stated purposes of the exemption; (B) harms the former workers

of the Participating Employer of the Retirement Plan, including workers of SAMC; (C)

put the competitors of SAMC and FSCSC at an economic disadvantage; (D) relieved

SAMC and FSCSC of no genuine religious burden created by ERISA; and (E) created

more potential government entanglement with alleged religious belief that compliance

with ERISA would have created.

365. <u>Not Necessary to Further Stated Purpose</u>.  Congress enacted the Church Plan exemption to avoid "examinations of books and records . . . an unjustified invasion of the confidential relationship . . . with regard to churches and their religious activities."[3] This purpose has no application to SAMC or FSCSC, which are neither run by nor intimately connected to any church financially.  And, unlike a church, SAMC and FSCSC have no confidential books and records to shield from government scrutiny.  During the time SAMC and FSCSC sponsored and maintained the Retirement Plan, they purported to disclose all material financial records and relationships when they sought Medicare and Medicaid reimbursements for the services they provided, and when they issued tax-exempt bonds.

366. <u>Workers Harmed</u>.  SAMC and/or FSCSC were not legally required to provide pensions; instead, they chose to establish the Retirement Plan in order to reap tax rewards and attract and retain employees in a competitive labor market.  SAMC and FSCSC hired without regard to the religious faith of prospective employees; indeed, any choice of faith, or lack thereof, was not a factor in the recruiting and hiring of SAMC and FSCSC employees.  Thus, as a practical matter, and by SAMC's and FSCSC's own designs, the participants in the Retirement Plan included people of a vast number of divergent faiths, as well as those who belong to no faith.  In choosing to recruit and hire from the public at large, SAMC and FSCSC must be willing to accept neutral regulations, such as ERISA, imposed to protect those employees' legitimate interests.  To be constitutional, an accommodation such as the Church Plan exemption must not impose burdens on nonadherents without due consideration of their interests.  The Church Plan

---

[3] S. Rep. No. 93-383 (1972), *reprinted in* 1974 U.S.C.C.A.N. 4889, 4965.

exemption, as invoked by SAMC and FSCSC, placed the 1,900 participants' justified reliance on their pension benefits at great risk, resulting in the diminution of their benefits (collectively over $32 million) when the underfunded Retirement Plan was terminated in in 2012.

367.    Competitors Were Disadvantaged.  SAMC's and FSCSC's commercial rivals faced substantial disadvantages in their competition with SAMC and FSCSC because the rivals were required to use their current assets to fully fund their pension plan obligations, insure (through premiums paid to the PBGC) and administer their plans, as well as provide other ERISA protections.  In claiming that the Retirement Plan was an exempt Church Plan, SAMC and FSCSC enjoyed a material competitive advantage because they were able to divert significant cash, which otherwise would be required to fund, insure (through premiums to the PBGC), and administer the Retirement Plan, to its competitive growth strategy.  To be constitutional, an accommodation such as the Church Plan exemption must take adequate account of harm to non-beneficiaries.  The Church Plan exemption, as applied by SAMC and FSCSC, provides no consideration of the disadvantage it created for the competitors of SAMC and FSCSC.

368.    Relieved No Genuine Religious Burden Imposed by ERISA.  An exemption exclusively for religion must alleviate a significant, state imposed interference with religious exercise.  The Church Plan exemption, as claimed by SAMC and FSCSC, responded to no genuine burden created by ERISA on any religious practice of SAMC and/or FSCSC.  ERISA is materially indistinguishable from the array of neutral Congressional enactments that do not significantly burden religious exercise when applied to commercial activities.

369.    <u>Creates Government Entanglement with Alleged Religious Beliefs</u>. Exempting a plan as a Church Plan in the absence of the sponsorship of a plan by a church requires courts and agencies to examine unilateral religious "convictions" of non-church entities and determine if they are "shared" with a church, in the absence of any actual church responsible for the pensions.  This creates entanglement between government and putative religious beliefs.  ERISA compliance, on the other hand, requires zero entanglement with religion for SAMC and FSCSC because ERISA is a neutral statute that regulates pension protections, and SAMC and FSCSC have no relevant confidential books, records or relationships.  Thus, an extension of the Church Plan exemption to SAMC and FSCS produces state entanglement with alleged religious beliefs while the adherence of the Retirement Plan to ERISA creates no meaningful state entanglement with alleged religious beliefs

370.    Plaintiffs seek a declaration by the Court that the Church Plan exemption, as claimed by SAMC and FSCSC, is an unconstitutional accommodation under the Establishment Clause of the First Amendment, and is therefore void and ineffective.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against the Defendants on all claims and request that the Court award the following relief:

1.      Declaring that the Retirement Plan is an employee benefit plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2); is a defined benefit pension plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35); and is not a Church Plan within the definition of ERISA § 3(33), 29 U.S.C. § 1002(33).

2.     Declaring that the Retirement Plan was not properly terminated in compliance with ERISA § 4041, 29 U.S.C. § 1341 and the Plan continues to be an ERISA-covered plan subject to all the funding requirements of ERISA for which SAMC, the Participating Employers, including Holding Corporation and Communities, are liable.

3.     Declaring that FSCSC, as the sole corporate member of SAMC and Communities, is part of a controlled group that is jointly and severally liable along with SAMC and Communities for any unfunded benefits under the Plan.

4.     Declaring that Franciscan Alliance, as the 100% shareholder of Holding Corp., is part of a controlled group that is jointly and severally liable along with Franciscan Holding Corp. for any unfunded benefits under the Plan.

5.     Ordering SAMC and FSCSC to reform the Retirement Plan to bring the Retirement Plan into compliance with ERISA, including as follows:

   A.     Revising the Retirement Plan documents to reflect that the Retirement Plan is a defined benefit plan regulated by ERISA.

   B.     Requiring SAMC and FSCSC to fund the Retirement Plan in accordance with ERISA's funding requirements, disclose required information to the Retirement Plan's participants and beneficiaries, and otherwise comply with all other reporting, vesting, and funding requirements of Parts 1, 2 and 3 of ERISA, 29 U.S.C. §§ 1021-31, 1051-61, 1081-85.

C. Reforming the Retirement Plan to comply with ERISA's accrual requirements and providing benefits in the form of a qualified joint and survivor annuity.

D. Requiring the adoption of an instrument governing the Retirement Plan that complies with ERISA § 402, 29 U.S.C. § 1102.

E. Requiring SAMC, FSCSC, and/or the Retirement Committee to comply with ERISA reporting and disclosure requirements, including by filing Form 5500 reports, distributing ERISA-compliant Summary Plan Descriptions, Summary Annual Reports and Participant Benefit Statements, and providing Notice of the Retirement Plan's funding status and deficiencies.

F. Requiring the establishment of a Trust in compliance with ERISA § 403, 29 U.S.C. § 1103.

6. Ordering SAMC and FSCSC to terminate the Plan in compliance with ERISA § 4041, 29 U.S.C. § 1341 and directing that SAMC, Holding Corporation and Communities, as contributing sponsors of the Plan, and FSCSC as a member of the FSCSC controlled group and Franciscan Alliance as a member of the Holding Corporation controlled group, are jointly and severally liable for the total amount of unfunded benefit liabilities as of the termination date to all participants and beneficiaries of the Retirement Plan, together with interest pursuant to ERISA § 4062 (a) and (b), 29 U.S.C § 1362(a) and (b),

7.       Alternatively, entering a judgment against SAMC, FSCSC, Holding Corporation and Communities, and Franciscan Alliance for joint and several liability for the total amount of unfunded benefit liabilities as of date the Plan was terminated plus interest pursuant to ERISA § 4062 (a) and (b), 29 U.S.C § 1362(a) and (b), to be distributed to the Class.

8.       Requiring SAMC, FSCSC, the Individual Defendants, the Retirement Committee and the Members of the FSCSC Board of Directors, as fiduciaries of the Plan, to make the Retirement Plan whole for any losses and disgorge any profits accumulated by such Defendants as a result of their fiduciary breaches.

9.       Appointing an Independent Fiduciary to hold the Retirement Plan's assets in trust, to manage and administer the Retirement Plan and their assets, and to enforce the terms of ERISA.

10.      Requiring SAMC and/or FSCSC to pay a civil money penalty of up to $110 per day to Plaintiffs and each Class member for each day they failed to inform Plaintiffs and each Class member of their failure to properly fund the Plan.

11.      Requiring SAMC and/or FSCSC and/or the Retirement Committee to pay a civil money penalty of up to $110 per day to Plaintiffs and each Class member for each day it failed to provide Plaintiffs and each Class member with a Funding Notice.

12.      Requiring SAMC, FSCSC, and/or the Retirement Committee to pay a civil money penalty of up to $110 per day to Plaintiffs and each Class member

for each day it failed to provide a benefit statement under ERISA § 105(a)(1)(B), 29 U.S.C. § 1025(a)(1)(B).

13.    Ordering declaratory and injunctive relief as necessary and appropriate, including enjoining the Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Retirement Plan.

14.    Declaring with respect to Count XIV that the Church Plan exemption, as claimed by SAMC and FSCSC, is an unconstitutional accommodation under the Establishment Clause of the First Amendment and is therefore void and ineffective.

15.    Awarding to Plaintiffs attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g) and/or other applicable doctrine.

16.    Awarding to Plaintiffs taxable costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), 28 U.S.C. § 1920, and other applicable law.

17.    Awarding to Plaintiffs pre-judgment interest on any amounts awarded pursuant to law.

18.    Awarding, declaring or otherwise providing Plaintiffs and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper.

Dated:  June 30, 2016          ____/s/ Carol V. Gilden_____

                               COHEN MILSTEIN SELLERS & TOLL, PLLC
                               Carol V. Gilden, IL Bar No. 6185530

190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Tel: (312) 357-0370 / Fax: (312) 357-0369
Email: cgilden@cohenmilstein.com

COHEN MILSTEIN SELLERS & TOLL, PLLC
Karen L. Handorf
Michelle C. Yau
Julie Goldsmith Reiser
Kira Hettinger


1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600 / Fax: (202) 408-4699
Email: khandorf@cohenmilstein.com
myau@cohenmilstein.com
jreiser@cohenmilstein.com
khettinger@cohenmilstein.com


KELLER ROHRBACK L.L.P.
Lynn Lincoln Sarko
Erin M. Riley
Laura R. Gerber
Havila Unrein
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900 / Fax: (206) 623-3384
Email: lsarko@kellerrohrback.com
eriley@kellerrohrback.com
lgerber@kellerrohrback.com
hunrein@kellerrohrback.com

KELLER ROHRBACK P.L.C.
Ron Kilgard
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088 / Fax: (602) 248- 2822
Email: rkilgard@kellerrohrback.com


**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2016, I caused a copy of the foregoing Second Amended Complaint to be served via the Court's ECF system upon all counsel of record, and emailed and mailed to counsel for Defendants at the addresses below:

Neil Hunter Dishman
Sarah J. Gasperini
JACKSON LEWIS P.C.
150 N. Michigan Ave.
Suite 2500
Chicago, IL 60601
Tel: (312) 787-4949
Fax: (312) 787-4995
Email: dishmann@jacksonlewis.com
gasperis@jacksonlewis.com

René M. Thorne
Charles F. Seeman, III
JACKSON LEWIS P.C.
650 Poydras Street
Suite 1900
New Orleans, LA 70130
Tel: (504) 208-5891 / Fax: (504) 208-1759
Email: thorner@jacksonlewis.com
charles.seeman@jacksonlewis.com

*Counsel for Defendants*

Stuart F. Delery
Zachary T. Dardon
Judry L. Subar
Bradley Cohen
US Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW, Room 7338
Washington, DC 20530
Tel: (202) 305-9855
Fax: (202) 618-8202
Email: Stuart.Delery@usdoj.gov
        Zachary.Dardon@usdoj.gov
        Judry.Subar@usdoj.gov
        Bradley.Cohen@usdoj.gov

*Counsel for U.S. Attorney General*

_____/s/ Kira Hettinger_____
Kira Hettinger